1  Ronald D. Foreman (SBN 61148)
   **FOREMAN & BRASSO**
2  930 Montgomery Street, Suite 600
   San Francisco, CA 94133
3  Telephone:    (415) 433-3475
   Facsimile:    (415) 781-8030
4  Email: foremanandbrasso@foremanandbrasso.com

5  Attorneys for Defendant
   MICHAEL T. BLATT.
6

7

8              **UNITED STATES DISTRICT COURT**

9    **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11  LIBERTY MUTUAL INSURANCE          )    Case No. C06-2022 SC
    COMPANY,                          )
12                                    )    **DECLARATION OF RONALD D.**
              Plaintiff,              )    **FOREMAN IN OPPOSITION TO**
13                                    )    **THE MOTION FOR SUMMARY**
    v.                                )    **JUDGMENT, OR IN THE**
14                                    )    **ALTERNATIVE, FOR**
    MICHAEL T. BLATT,                 )    **SUMMARY ADJUDICATION OF**
15                                    )    **ISSUES**
              Defendant.              )
16                                    )

17  _____       Trial Date: November 19, 2007

18                                         Date:   October 26, 2007
                                           Time:   10:00 a.m.
19                                         Courtroom: 1, 17th floor

20

21       I, Ronald D. Foreman declare that if called to testify in this matter that I would

22  testify as hereinafter stated:

23       1. Attached hereto as **Exhibit 1** is a true and correct copy of the September 28,

24  1998 Residential Purchase Agreement between James Gabbert and Michael Blatt.

25       2.    Attached hereto as **Exhibit 2** is a true and correct copy of the June 9,

26  1997contract between Schnabel Foundation Company and Michael Blatt.

27       3.    Attached hereto as **Exhibit 3** is a true and correct copy of the June 20,

28  **DECLARATION OF RONALD D. FOREMAN IN OPPOSITION TO THE MOTION FOR SUMMARY
    JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES**

1  1997 Liberty Mutual Certificate of Insurance naming Michael Blatt as an additional
2  insured.

3      4.    Attached hereto as **Exhibit 4** is a true and correct copy of two checks
4  written by Michael Blatt to Alexander Anolik trust account on August 30, 2004,
5  totaling $143,000.

6      5.    Attached hereto as **Exhibit 5** is a true and correct copy are portions of
7  the January 23, 2004 deposition testimony of Paul Weir, plaintiff's construction
8  expert in the underlying action, describing his criticisms of the design work of
9  Schnabel Foundation, the drainage and water intrusion property damage, arising out
10 of the Schnabel operations and the construction.

11     6.    Attached hereto as **Exhibit 6** is a true and correct copy are portions of
12 the February 17, 2004, and February 18, 2004 trial testimony of Paul Weir describing
13 his criticisms of the design work of Schnabel Foundation, the drainage and water
14 intrusion property damage, arising out of the Schnabel operations and the
15 construction.

16     7.    Attached hereto as **Exhibit 7** is a true and correct copy of the
17 Declaration of Melodee A. Yee in Support of Liberty Mutual Insurance Company's
18 Application For Default Judgment by Court in which he describes charges which
19 Liberty Mutual contends are not covered under its policy which amount to
20 $15,106.13.

21     8.    Attached hereto as **Exhibit 8** is a true and correct copy of the Cross-
22 Complaint For Damages and Declaratory Relief in the underlying action, filed with
23 the Court on April 30, 2002.

24     9.    Attached hereto as **Exhibit 9** is a true and correct copy of a September
25 7, 2004 letter from Ronald D. Foreman to Joseph D. Ryan.

26     10.   Attached hereto as **Exhibit 10** is a true and correct copy of a March 21,
27 2002 letter from Ronald D. Foreman to Liberty Mutual Insurance Company's Claims

28 **DECLARATION OF RONALD D. FOREMAN IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES**

1  Department.

2      I declare, under penalty of perjury under the laws of the State of California

3  that the foregoing is true and correct.

4  Dated: October ___, 2007                    By: _____

5                                                    Ronald D. Foreman

6

7

8

9

10

11

12  L:\FAB\Blatt\Liberty

13  Mutual\Pleadings\RDFDECOpptomotsumjudge.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF RONALD D. FOREMAN IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES**

# EXHIBIT 1

SELLER'S COPY
ORIGINAL

# RESIDENTIAL PURCHASE AGREEMENT
## FOR NEWLY CONSTRUCTED PROPERTY



**DEFINITIONS**

BROKER includes cooperating brokers and all sales persons. DAYS means calendar days unless otherwise specified. DATE OF ACCEPTANCE means the date Seller accepts the offer or the Buyer accepts the counter offer. DELIVERED means personally delivered, transmitted by facsimile machine, by a nationally recognized overnight courier, or by deposit in the U.S. Mail, postage prepaid. In the event of mailing, the document will be deemed delivered three (3) business days after deposit. In the event of overnight courier, one (1) business day after deposit; and if by facsimile, at time of transmission provided that a transmission report is generated and retained by the sender reflecting the accurate transmission of the document. Unless otherwise provided in this Agreement or by law, delivery to the agent will constitute delivery to the principal. DATE OF CLOSING means the date title is transferred. TERMINATING THE AGREEMENT means that both parties are relieved of their obligations and all deposits will be returned to Buyer less expenses incurred by or on account of Buyer to date of termination. PROPERTY means the real property and any personal property included in the sale.

**AGENCY RELATIONSHIP CONFIRMATION.** The following agency relationship is hereby confirmed for this transaction and supersedes any prior agency election.
LISTING AGENT: _____
_____ is the agent of (check one):
(Print Firm Name)
☐ the Seller exclusively; or ☐ both the Buyer and the Seller.

SELLING AGENT: Douglas P. Ferguson _____ (if not the same as the Listing Agent) is the agent of (check one):
(Print Firm Name)
☒ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and the Seller.
**Note: This confirmation DOES NOT take the place of the AGENCY DISCLOSURE form (P.P. Form 110.42 CAL) required by law,**

situated in _____ JAMES T. GABBERT _____, hereinafter designated as BUYER offers to purchase the real property
commonly known as _____ SAUSALITO _____, County of _____ MARIN _____, California,
FOR THE PURCHASE PRICE OF $ 2,540,000.00 ( TWO MILLION FIVE HUNDRED FORTY THOUSAND ---- 00/100
443 BRIDGEWAY also "CASA SPLENDIDO"
☒ Buyer does ☐ Buyer does not intend to occupy the property as his or her residence.
Dollars) on the following terms and conditions:
1. **FINANCING TERMS AND LOAN PROVISIONS.**
  A. $ 250,000.00    DEPOSIT evidenced by ☒ check, or ☐ other: _____
held uncashed until acceptance and not later than three (3) business days thereafter deposited with: ____
  B. $ N/A    ADDITIONAL CASH DEPOSIT to be placed in escrow SELLER OUT OF ESCROW ☐ within ____ days after acceptance, ☐ upon
receipt of Loan Commitment per Item 2. ☐ Other: _____
  C. $ 2,290,000.00    BALANCE OF CASH PAYMENT needed to close, not including closing costs.
  D. $ N/A    NEW FIRST LOAN: ☐ CONVENTIONAL ☐ FHA, ☐ VA, ☐ Other financing acceptable to Buyer:
☐ FIXED RATE: For _____ years, interest not to exceed _____ %, payable at approximately
_____ per month (principal and interest only), with the balance due in not less than _____ years.
☐ ARM: For _____ years, initial interest rate not to exceed _____ %, with initial monthly payments of
_____ and maximum lifetime rate not to exceed _____ %.
☐ Buyer will pay loan fee or points not to exceed _____
☐ Lender to appraise property as no less than purchase price.
If FHA or VA, Seller will pay _____ % discount points, and other fees and costs not to exceed
$ _____
  E. $ N/A    OTHER TERMS: _____
OTHER FINANCING: _____
  F. $ 2,540,000.00    TOTAL PURCHASE PRICE (not including closing costs).
2. **LOAN APPROVAL.** Conditioned upon Buyer's ability to obtain a commitment for new financing, as set forth above, from a lender or mortgage broker of Buyer's choice, and/or consent to assumption of existing financing provided for in this Agreement, within N/A days after acceptance. Buyer will in good faith use his or her best efforts to qualify for and obtain the financing and will complete and submit a loan application within five (5) days after acceptance. Buyer ☐ will, ☒ will not provide a prequalification letter from lender or mortgage broker based on Buyer's application and credit report within N/A days after acceptance. In the event a loan commitment or consent is obtained but not timely honored without fault of Buyer, Buyer may terminate this Agreement.
3. **BONDS AND ASSESSMENTS.** All bonds and assessments which are part of or paid with the property tax bill will be assumed by the Buyer. In the event there are other bonds or assessments which have an outstanding principal balance and are a lien upon the property, the current installment will be prorated between Buyer and Seller as of the date of closing. Payments not yet due will be assumed by Buyer WITHOUT CREDIT toward the purchase price, EXCEPT AS FOLLOWS: _____
_____ N/A _____
This Agreement is conditioned upon both parties verifying and approving in writing the amount of any bond or assessment to be assumed/or paid within ten (10) days after receipt of the preliminary title report. In the event of disapproval, the disapproving party may terminate this Agreement.

Buyer [signature] [ ] and Seller [signature] [ CG ] have read this page.
**CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.**

Page 1 of 6
FORM 101-N.1 CAL (6-93)    COPYRIGHT ©1994-98 BY PROFESSIONAL PUBLISHING, 355 BEL MARIN KEYS BLVD., SUITE 100, NOVATO CA 94949    (415) 884-2164
This form prepared by Formulator™ for computer    800-336-1027

**PROFESSIONAL PUBLISHING**

EXHIBIT A

BLA 00159

Property Address _____ 445 BRIDGEWAY and "CASA SPLENDIDO" SAUSALITO, CA

4. **PROPERTY TAX** Within three (3) days after acceptance, Seller will deliver to Buyer for his or her approval a copy of the latest property tax bill. Buyer is advised that: (a) the property will be reassessed upon change of ownership which may result in a tax increase; and (b) the tax bill may not include certain exempt taxes such as school taxes on property owned by seniors. Buyer should make further inquiry at the assessors office. Within five (5) days after receipt of the tax bill, Buyer will in writing approve or disapprove the tax bill. In the event of disapproval, Buyer may terminate this Agreement.

5. **EXISTING LOANS.** Seller will, within three (3) days after acceptance, provide Buyer with copies of all notes and deeds of trust to be assumed or taken subject to. Within five (5) days after receipt Buyer will notify Seller in writing of his or her approval or disapproval of the terms of the documents. Approval will not be unreasonably withheld. Within three (3) days after acceptance, Seller will submit a written request for a current Statement of Condition on the above loan(s). Seller warrants that all loans will be current at close of escrow. Seller will pay any prepayment charge imposed on any existing loan paid off at close of escrow. Buyer will pay the prepayment charge on any loan which is to remain a lien upon the property after close of escrow. The parties are encouraged to consult his or her lender regarding prepayment provisions and any due on sale clauses.

6. **DESTRUCTION OF IMPROVEMENTS.** If the improvements of the property are destroyed, materially damaged, or found to be materially defective as a result of such damage prior to close of escrow, Buyer may terminate this Agreement by written notice delivered to Seller or his or her Broker, and all deposits will be returned. In the event Buyer does not elect to terminate this Agreement, Buyer will be entitled to receive, in addition to the property, any insurance proceeds payable on account of the damage or destruction.

7. **EXAMINATION OF TITLE.** In addition to any encumbrances assumed or taken subject to, Seller will convey title to the property subject only to: (1) real estate taxes not yet due; and (2) covenants, conditions, restrictions, rights of way and easements of record, if any, which do not materially affect the value or intended use of the property. Within three (3) days after acceptance, Buyer will order a Preliminary Title Report and copies of CC&Rs and other documents of record if applicable. Within ten (10) days after receipt, Buyer will report to Seller in writing any valid objections to title contained in such report (other than monetary liens to be paid upon close of escrow). If Buyer objects to any exceptions to the title, Seller will use due diligence to remove such exceptions at his or her own expense before close of escrow. If such exceptions cannot be removed before close of escrow, this Agreement will terminate, unless Buyer elects to purchase the property subject to such exceptions. If Seller concludes he or she is in good faith unable to remove such objections, Seller will so notify Buyer within ten (10) days after receipt of said objections. In that event Buyer may terminate this Agreement.

8. **EVIDENCE OF TITLE** will be in the form of a CLTA or ALTA owners policy of title insurance, issued by _____ CHICAGO TITLE INSURANCE COMPANY _____ paid by ☒ Buyer, ☐ Seller. coverage under a CLTA policy. the ALTA policy may offer additional coverage for a number of unrecorded matters. Buyer should discuss the choice of a CLTA or ALTA policy with the title company of their choice at the time escrow is opened. **NOTE:** In addition to lender requires an ALTA lender's policy of title insurance. ☒ Buyer, ☐ Seller will pay the premium.

9. **PRORATIONS.** Rents, real estate taxes, interest, payments on bonds and assessments assumed by Buyer, and homeowners association fees will be prorated as of the date of recordation of the deed. Security deposits, advance rentals, or considerations involving future lease credits will be credited to Buyer.

10. **CLOSING.** Full purchase price to be paid and deed to be recorded ☒ on or before _____ 5 DAYS FROM COE ___, OR ☐ within _____ days after acceptance. Both parties will deposit with an authorized escrow holder, to be selected by Buyer, all funds and instruments necessary to complete the sale in accordance with the terms of this Agreement. ☒ Where customary, signed escrow instructions will be delivered to escrow holder within _____ days after acceptance. Escrow fee to be paid by _____ BUYER County/City transfer tax(es), if any, to be paid by _____. Homeowner association transfer fee to be paid by _____ SELLER **THIS PURCHASE AGREEMENT TOGETHER WITH ANY ADDENDA WILL CONSTITUTE JOINT ESCROW INSTRUCTIONS TO THE ESCROW HOLDER.**

11. **PHYSICAL POSSESSION.** Physical possession of the property, with keys to all property locks, alarms, and garage door openers, will be delivered to Buyer (check one): ☒ On the date of recordation of the deed, not later than _____ 12:00 ☐ a.m. ☐ p.m.; ☐ On the _____ day after recordation, not later than _____ ☐ a.m. ☐ p.m.

12. **INSULATION.** The following conforms with the Federal Trade Commission requirement that any contract for the sale of a new home contain information regarding the type, thickness and R-Value of the insulation installed in each part of the house:
Type _____ EXTERIOR WALLS
Type _____ FIBERGLASS BATTS _____ Thickness _____ 5" _____ R-Value _____ R-30
ROOF
Type _____ FIBERGLASS RIGID _____ Thickness _____ 5" _____ R-Value _____ R-30

13. **CONDITION OF PROPERTY.** The property is warranted by Seller against defective material and workmanship for a period of one (1) year from date of occupancy. All material and workmanship warranties will be assigned to Buyer. This Warranty will apply as to any particular defect only in the event written notice of such defect is received by Seller within the one (1) year warranty period. Seller reserves the right to repair or replace any defect in the property. Repair or replacement of a defect will be undertaken as promptly as possible under the circumstances, but in no event will Seller be liable for any special or consequential damages. This warranty does not apply to: (a) chips, breakage, and missing items which were inspected and accepted during the punch list tour or otherwise; (b) minor settling cracks normal to home construction; (c) wear and tear arising out of occupancy of the property by Buyer; (d) damage caused by alterations or additions made by others; or (e) damage caused by movers. Buyer and Seller understand and acknowledge that the Broker will not in any circumstance be liable for any breach of this clause.

Buyer [ ___ ] [ ___ ] and Seller [ ___ ] [ ___ ] have read this page. **CAUTION:** The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.

Page 7 of 8

FORM 101-N.2 OAL (0-94) COPYRIGHT ©1994 BY PROFESSIONAL PUBLISHING, 366 DEL MARIN KEYS BLVD., SUITE OR, NOVATO CA 94949 (415)883-3164

☒ **PROFESSIONAL PUBLISHING**

BLA 00160

Property Address _____ 445 RIDGEWAY AKA "CASA SPLENDIDO", SAUSALITO, CA

16. **PERSONAL PROPERTY.** The following personal property, on the premises when inspected by Buyer, is included in the purchase price and will be transferred to Buyer free of liens and property identified by 2 Bill of Sale at close of escrow. No warranty is made as to the condition of the property: **all appliances in Seller's specs, w/warranties.**

17. **TRANSFER DISCLOSURE STATEMENT (TDS).** Unless the property is exempt, Seller will comply with Civil Code § 1102 by providing Buyer with a completed Real Estate Transfer Disclosure Statement (Statutory P.P. Form 110.21-23 CAL). The completed statement will consist of disclosure by the Seller, Listing Agent, and Selling Agent.
☐ Property is exempt because a public report has been issued or Business and Prof. Code § 11010.4 applies.
☐ Buyer has received and read the completed TDS.
☒ Seller will provide to Buyer the completed TDS within five (5) days after acceptance.

Buyer and Seller agree that any new reports or other documents received by Buyer after receipt of the TDS are automatically deemed an amendment to the TDS. If any disclosure or a material amendment of any disclosure is delivered after the execution of an offer to purchase, the Buyer will have three (3) days after delivery in person or five (5) days after deposit in the mail to terminate his or her offer by delivery of a written notice of termination to Seller or Seller's Agent.

Buyer and Seller understand that no provision in the TDS obligates the Seller to correct or improve the condition of items disclosed. However, disclosure will not relieve Seller of his or her obligation under item 13, CONDITION OF PROPERTY.

Seller agrees to hold all Brokers in the transaction harmless and to defend and indemnify them from any claim, demand, action or proceeding resulting from any omission or alleged omission by Seller in his or her Real Estate Transfer Disclosure Statement or supplement.

18. **SUPPLEMENT TO STATUTORY DISCLOSURE STATEMENT. Within __5__ days** after acceptance, Seller will provide the following or comparable disclosure supplement(s) to Buyer:
☐ P.P. FORM 110.31-33 CAL, SUPPLEMENT TO TDS.          ☒ P.P. FORM 110.35-38 CAL, CONDOMINIUM DISCLOSURE SUPPLEMENT.
☐ P.P. FORM 110.72, NOTICE RE: SEPTIC SYSTEMS.          ☐ P.P. FORM 110.90-92 CAL, STANDARD DISCLOSURES AND DISCLAIMERS.
☐ P.P. FORM 110.27 CAL, NATURAL HAZARD DISCLOSURE STATEMENT.          ☐ Other: _____

17. **ACCESS TO PROPERTY.** Seller agrees to provide reasonable access to the property to Buyer and inspectors, appraisers, and all other professionals representing Buyer.

18. **WALK-THROUGH INSPECTION.** Buyer will have the right to conduct a walk-through inspection of the property within __3__ days prior to close of escrow, to verify Seller's compliance with the provisions under item 13, CONDITION OF PROPERTY, and item 14, PERSONAL PROPERTY. This right is not a condition of this Agreement and Buyer's sole remedy for an alleged breach of these items is a claim for damages. Utilities are to remain turned on until the close of escrow.

19. **COMPLIANCE WITH LOCAL LAWS.** Seller will comply with any local laws applicable to the sale or transfer of the property, including but not limited to: Providing inspections and/or reports for compliance with local building and permit regulations, including septic system inspection reports; compliance with minimum energy conservation standards; and compliance with water conservation measures. All required inspections and reports will be ordered within three (3) days after acceptance and will be paid by ☐ Seller, ☐ Buyer. If Seller does not agree within five (5) days after receipt of a report to pay the cost of any repair or improvement required to comply with such laws, Buyer may terminate this Agreement.

20. **OPTIONAL PROVISIONS.** The provisions in this item 20, if initialled by Buyer and Seller are included in this Agreement.

20-A. [____] [____] **INSPECTIONS OF PHYSICAL CONDITION OF PROPERTY.** Buyer will have the right to retain, at his or her expense, licensed experts including but not limited to engineers, geologists, architects, contractors, surveyors, and structural pest control operators to inspect the property for any structural and nonstructural conditions, including matters concerning roofing, electrical, plumbing, heating, cooling, appliances, well, septic system, pool, boundaries, geological and environmental hazards, toxic substances including asbestos, formaldehyde, radon gas, and lead-based paint, Buyer, if requested by Seller in writing, will promptly furnish, at no cost to Seller, copies of all written inspection reports obtained. Buyer will approve or disapprove in writing all inspection reports obtained within ____ days after acceptance.

20-B. [____] [____] **COMMON INTEREST DEVELOPMENT DISCLOSURE. Within ten (10) days** after acceptance, Seller, at his or her expense, agrees to provide to Buyer the management documents and other information required by California Civil Code § 1368. Within five (5) days after receipt, Buyer will notify Seller in writing of approval or disapproval of the documents and information. In case of disapproval, Buyer may terminate this Agreement.

Any delinquent assessments including penalties, attorney's fees, and other charges that are or could become a lien on the property will be credited to Buyer at close of escrow.

20-C. [____] [____] **TAX DEFERRED EXCHANGE (INVESTMENT PROPERTY).** In the event that Seller wishes to enter into a tax deferred exchange for the property, or Buyer wishes to enter into a tax deferred exchange with respect to property owned by him or her in connection with this transaction, each of the parties agrees to cooperate with the other party in connection with such exchange, including the execution of such documents as may be reasonably necessary to complete the exchange; provided that: (a) the other party will not be obligated to delay the closing (b) all additional costs in connection with the exchange will be borne by the party requesting the exchange; (c) the other party will not be obligated to execute any note, contract, deed or other document providing for any personal liability which would survive the exchange; and (d) the other party will not take title to any property other than the property described in this Agreement. It is understood that a party's rights and obligations under this Agreement may be assigned to a third party intermediary to facilitate the exchange. The other party will be indemnified and held harmless against any liability which arises or is claimed to have arisen on account of the exchange.

Buyer [____] [____] and Seller [____] [CB] [____] have read this page.

**CAUTION:** The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.

Page 3 of 6

FORM 101-H.1 CAL (8-88)          COPYRIGHT © 1988 BY PROFESSIONAL PUBLISHING, 355 BEL MARIN KEYS BLVD., NOVATO, CA 94948

PROFESSIONAL PUBLISHING

AUG-09-01 THU 11:44    KANE CORPORATION    FAX NO. 6503698106    P. 04/19

Property Address _____ 445 BRIDGEWAY 2nd "CASA ESCONDIDA", SAUSALITO, CA _____

21. CONTINGENT ON SALE (Please check one of the following):
   A. ☒ CONTRACT IS NOT CONTINGENT upon the sale or close of any property owned by Buyer.
   B. ☐ CONTRACT IS CONTINGENT on Buyer's Property at
   _____ which is in escrow and concerning which all contingencies ☐ have, ☐ have not
   been satisfied, closing on or before _____. If Buyer's escrow is terminated, abandoned, or does not
   close on time, this Agreement will terminate without further notice unless the parties agree otherwise in writing.
   C. ☐ CONTRACT IS CONTINGENT on Buyer accepting an offer for his or her property at
   on or before _____ within _____ days after acceptance of this Agreement, and that said sale closing
   Buyer has accepted an offer on the sale of his or her property, Buyer will promptly provide a written notice of the sale to
   Seller. If Buyer's purchase agreement is subject to the sale of another property, it does not qualify without the written con-
   sent of Seller. Upon providing notice of the qualified sale, this Agreement will still be contingent on Buyer's property closing
   as specified in this Item 21-C. If Seller accepts a bonafide written offer from a third party prior to Buyer accepting an offer
   on the sale of his or her property, Seller may give Buyer written notice of that fact. Within three (3) days of receipt of the no-
   tice, Buyer will waive the contingency on the sale and close of his or her property, or this Agreement will terminate without
   further notice. Upon waiver of the contingency, if the contingency is not contingent upon the sale and/or close of any property,
   and Buyer's ability to obtain financing is not contingent upon the sale and/or close of any property.

22. DEFAULT - LIQUIDATED DAMAGES.
   A. If the escrow does not close on or before the date set forth in Item 10, or a later closing date mutually
   agreed to by Seller and Buyer, within 15 days after closing date set forth in Item 10, or the extended clos-
   ing date mutually agreed to by Seller and Buyer, Seller will, except as provided in (B) below, order all of
   the moneys remitted by Buyer under the terms of this contract to be refunded to Buyer.
   B. If Buyer fails to complete the purchase of the property because of a default by Buyer, Seller may
   pursue any remedy in law or equity that it may have against Buyer on account of the default; provided,
   however, that by placing their initials in the spaces below,
   [✗✗] Buyer agrees                                        [_____] Buyer does not agree
   CB [_____] Seller agrees                                 [_____] Seller does not agree
   that:
   1. $ ___220,000___, an amount not to exceed the money deposited by Buyer under this contract will
   constitute liquidated damages payable to Seller if Buyer fails to complete the purchase of the property
   because of a default by Buyer.
   2. The payment of such liquidated damages to Seller will constitute the exclusive remedy of Seller on
   account of any default by Buyer.
   3. Liquidated damages will be payable to Seller out of Buyer's deposits toward purchase of the property
   according to the following procedures:
      a. The Seller will give written notice ("Seller's notice and demand") in the manner prescribed by
      § 116,240 of the Code of Civil Procedure for service in a small claims action, to escrow holder and
      to Buyer that Buyer is in default under this Agreement and that Seller is demanding that the escrow
      holder remit the aforesaid amount from the deposits to Seller as liquidated damages unless, within
      twenty (20) days, Buyer gives the escrow holder Buyer's written objection to disbursement of said
      deposits as liquidated damages ("Buyer's objection").
      b. Buyer will have a period of 20 days from the date of receipt of Seller's notice and demand in which
      to give the escrow holder Buyer's objection.
      c. If Buyer fails to give the escrow holder Buyer's objection within 20 days from the date of receipt of
      Seller's notice and demand: (a) escrow holder will promptly remit the amount demanded to Seller;
      and (b) Seller is released from any obligation to sell the property to Buyer.
      d. If Buyer gives escrow holder Buyer's objection within 20 days from the date of receipt of Seller's
      notice and demand, then the determination as to whether Seller is entitled to the disbursement of
      the deposits as liquidated damages, and every other cause of action that has arisen between Buyer
      and Seller under this Agreement, will be settled by arbitration in accordance with the provisions of
      Item 25, ARBITRATION OF DISPUTES.
      e. If the determination as to whether Seller is entitled to disbursement of the deposit as liquidated
      damages is referred to arbitration, any fee to initiate arbitration will be paid by Seller, but the cost
      of arbitration will ultimately be borne as determined by the arbitrator.

23. DEFAULT. In the event Buyer defaults in the performance of this Agreement (unless Buyer and Seller have agreed to liquidated
   damages), Seller may, subject to any rights of Broker, retain Buyer's deposit to the extent of damages sustained and may take
   such actions as he or she deems appropriate to collect such additional damages as may have been actually sustained. Buyer will
   have the right to take such action as he or she deems appropriate to recover such portion of the deposit as may be allowed
   by law. In the event that Buyer defaults, or unless Buyer and Seller have agreed to liquidated damages, Buyer agrees to pay
   the Broker(s) any commission that would be payable by Seller in the absence of such default.

   Buyer [__✗__][_____] and Seller [__CB__][____] have read this page.

CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any
means including scanning or computerized formats.

Page 4 of 5

FORM 101-N.4 CAL (8-95)   COPYRIGHT ©1995 BY PROFESSIONAL PUBLISHING, 305 DEL MARIN KEYS BLVD., SUITE 500, NOVATO, CA 94949   (415)884-7800

Property Address _____ 445 GATEWAY aka CASA SPLENDIDO, SAUSALITO, CA

24. MEDIATION OF DISPUTES. If a dispute arises out of or relates to this Agreement or its breach, by initialing in the "agree" spaces below the parties agree to first try in good faith to settle the dispute by voluntary non-binding mediation before resorting to court action or arbitration, unless the dispute is a matter excluded under Item 25 - ARBITRATION.

[_____][_____] Buyer agrees    [____X_____] Buyer does not agree
[_____][_____] Seller agrees    [____X_____] Seller does not agree

25. ARBITRATION OF DISPUTES. Any dispute or claim in law or equity arising out of this Agreement will be decided by neutral binding arbitration in accordance with the California Arbitration Act (C.C.P. §§ 1280 et seq.), and not by court action except as provided by California law for judicial review of arbitration proceedings. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The parties will have the right to discovery in accordance with Code of Civil Procedure § 1283.05.

The parties agree that the following procedure will govern the making of the award by the arbitrator: (a) a Tentative Award will be made by the arbitrator within 30 days following submission of the matter to the arbitrator; (b) the Tentative Award will explain the factual and legal basis for the arbitrator's decision as to each of the principal controverted issues; (c) the Tentative Award will be in writing unless the parties agree otherwise; provided, however, that if the hearing is concluded within one (1) day, the Tentative Award may be made orally at the hearing in the presence of the parties. Within 15 days after the Tentative Award has been served or announced, any party may serve objections to the Tentative Award. Upon objections being timely served, the arbitrator may call for additional evidence, oral or written argument or both. If no objections are filed, the Tentative Award will become final without further action by the parties or arbitrator. Within thirty (30) days after the filing of objections, the arbitrator will either make the Tentative Award final or modify or correct the Tentative Award, which will then become final as modified or corrected.

The following matters are excluded from arbitration: (a) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or real property sales contract as defined in Civil Code § 2985; (b) an unlawful detainer action; (c) the filing of enforcement of a mechanic's lien; (d) any matter which is within the jurisdiction of a probate court, or small claims court or (e) an action for bodily injury or wrongful death, or for latent or patent defects to which Code of Civil Procedure § 337.1 or § 337.15 applies. The filing of a judicial action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, will not constitute a waiver of the right to arbitrate under this provision.

NOTICE: By initialing in the "agree" space below you are agreeing to have any dispute arising out of the matters included in the "Arbitration of Disputes" provision decided by neutral arbitration as provided by California law and you are giving up any rights you might possess to have the dispute litigated in a court or jury trial. By initialing in the "agree" space below you are giving up your judicial rights to discovery and appeal, unless those rights are specifically included in the "Arbitration of Disputes" provision. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate under the authority of the California Code of Civil Procedure. Your agreement to this arbitration provision is voluntary.

We have read and understand the foregoing and agree to submit disputes arising out of the matters included in the "Arbitration of Disputes" provision to neutral arbitration.

[_____][_____] Buyer agrees    [____X_____] Buyer does not agree
[_____][_____] Seller agrees    [____X_____] Seller does not agree

26. ATTORNEY FEES. In any action or proceeding involving a dispute between Buyer and Seller arising out of the execution of this Agreement or the sale, whether for tort or for breach of contract, and whether or not brought to trial or final judgment, the prevailing party will be entitled to receive from the other party a reasonable attorney fee to be determined by the court or arbitrator(s).

27. EXPIRATION OF OFFER. This Offer will expire unless acceptance is delivered to Buyer or to _____ (Buyer's Broker) on or before _____ □ a.m. □ p.m. _____, 19____.

28. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which is deemed to be an original.

29. CONDITIONS SATISFIED/WAIVED IN WRITING. Each condition or contingency, covenant, approval or disapproval will be satisfied according to its terms or waived by written notice delivered to the other party or his or her Broker.

30. TIME. Time is of the essence of this Agreement; provided, however, that if either party fails to comply with any contingency in this Agreement within the time limit specified, this Agreement will not terminate until the other party delivers written notice to the defaulting party requiring compliance within 24 hours after receipt of notice. If the party receiving the notice fails to comply within the 24 hours, the non-defaulting party may terminate this Agreement without further notice.

31. SURVIVAL. The omission from escrow instructions of any provision in this Agreement will not waive the right of any party. All representations or warranties will survive the close of escrow.

32. ENTIRE AGREEMENT. This document contains the entire agreement of the parties and supersedes all prior agreements or representations with respect to the property which are not expressly set forth. This Agreement may be modified only in writing signed and dated by both parties. Both parties acknowledge that they have not relied on any statements of the real estate Agent or Broker which are not expressed in this Agreement.

Buyer [____X____][_____] and Seller [____X____][_____] have read this page.

CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.

Page 5 of 6

FORM 101-R.0 CAL (5-95)   COPYRIGHT © 1995, BY PROFESSIONAL PUBLISHING, 355 N.E. NORTH KEYS BLVD., SUITE 100, NOVATO, CA 94945

**PROFESSIONAL PUBLISHING**

Property Address _____ 445 BRIDGWAY aka "CASA SPLENDIDO", SAUSALITO, CA

33. ADDENDA. The following addenda are attached and made a part of this Agreement:
  ☒ Addendum No. 1 _____
  ☒ Addendum No. 2 _____

34. ADDITIONAL TERMS AND CONDITIONS.
  Buyer's execution of this Agreement constitutes an offer which
may be accepted by delivery of a copy of the Agreement to Buyer,
executed by Seller, by 5:00 p.m. on September 25, 1998.
_____
_____

LIMITATION OF AGENCY: A real estate broker or agent is qualified to advise on real estate. If you have any questions concerning the legal sufficiency, legal effect, insurance or tax consequences of this document or the related transactions, consult with your attorney, accountant or insurance advisor.

The undersigned Buyer acknowledges that he or she has thoroughly read and approved each of the provisions of this offer and agrees to purchase the property for the price and on the terms and conditions specified. Buyer acknowledges receipt of a copy of this offer.

Buyer _____

Buyer _____   Date Sept 24, 1998  Time 12:15 pm
                    JAMES J. GASHETT

       _____   Date _____  Time _____

## ACCEPTANCE

Seller accepts the foregoing Offer and agrees to sell the property for the price and on the terms and conditions specified.

NOTICE: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between the Seller and Broker.

35. COMMISSION. Seller agrees to pay in cash the following real estate commission for services rendered, which commission Seller hereby irrevocably assigns to Broker(s) from escrow:
_____% of the accepted price, or $ _____ , to the listing Broker;
and 2-1/2% of the accepted price, or $52,500 max to the selling Broker: (no incr. under Add. No. 2)
without regard to the agency relationship. Escrow instructions with respect to commissions may not be amended or revoked without the written consent of the Broker(s).

If Seller receives liquidated or other damages upon default by Buyer, Seller agrees to pay Broker(s) the lesser of the amount provided for above or one half of the damages after deducting any costs of collection, including reasonable attorney fees. Commission will also be payable upon any default by Seller, or the mutual rescission by Buyer and Seller without the written consent of the Broker(s), which prevents completion of the purchase. This Agreement will not limit the rights of Broker and Seller provided for in any existing listing agreement.

In any action for commission the prevailing party will be entitled to reasonable attorney fees whether or not the action is brought to trial or final judgment.

36. PROVISIONS TO BE INITIALED. The following items must be "agreed to" by both parties to be binding on either party. In the event of disagreement, Seller should make a counter offer.
Item 22. LIQUIDATED DAMAGES Item 24. MEDIATION OF DISPUTES Item 25. ARBITRATION OF DISPUTES

Seller acknowledges receipt of a copy of this Agreement. Authorization is given to the Broker(s) in this transaction to deliver a signed copy to Buyer and to disclose the terms of purchase to members of a Multiple Listing Service, Board or Association of REALTORS® at close of escrow.

37. SUBJECT TO: _____

Seller ___ M. ___ GTC _____   Date 9/29/98   Time _____
              MICHAEL B. BLATT

Seller _____   Date 9/29/98   Time _____
              CATHERINE B. BLATT

Receipt of Seller's acceptance acknowledged by Buyer or authorized agent on _____ (date)

CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.

Page 8 of 8
FORM IPT-M.6 CAL (4-96)   COPYRIGHT © 1996-96 BY PROFESSIONAL PUBLISHING, 205 SE MARIN DRIVE, SUITE 200, NOVATO, CA 94949   (415) 884-2164
This form produced by: FORMULATOR software   800-336-1027

[___] [___] (Initials)
Rev. by _____
Date _____

🏛 PROFESSIONAL
   PUBLISHING

BLA 00164

# EXHIBIT 2



# Schnabel
FOUNDATION COMPANY

# P R O P O S A L

TO:  **Michael Blatt**
5 Marion St.
Sausalito, CA  94965

REF:  **435 - 445, & 475 Bridgeway**

Sausalito, CA  94965

DATE:  6/9/97

**Attention:  Mike Blatt**
Phone:      (415) 331-9377
FAX:        (415) 331-9377

## SCOPE OF WORK

In accordance with the attached <u>GENERAL PROVISIONS OF THIS PROPOSAL</u>, we propose to furnish all materials, equipment and labor to complete the following:

Design, furnish and install approximately 5000 sf of  permanent soil nail walls in accordance with the following documents:

1.  Architectural plans prepared by Donald Olsen for 435-445 Bridgeway dated May 1, 1997, and for 475 Bridgeway, Rev. 4 date 3-27-97.
2.  Structural plans prepared by SAABCO for 435-445 Bridgeway dated 5/12/97, and for 475 Bridgeway, Rev. 1 date 10-18-96.
3.  Schnabel Foundation Company plans for 435-445 Bridgeway dated 6/2/97, and for 475 Bridgeway Rev. 2 dated 6/9/97.

Our proposal is based on the following conditions:

1.  We will provide a permanent shotcrete wall (rod finish). The wall will be constructed as indicated on Schnabel's plans.  Excavation (by others) shall be as indicated on Schnabel's plans.
2.  We will test approximately five (5) percent of the nails.
3.  Membrane curing will be used for the shotcrete walls.
4.  Foundations for the house and walls at 60 Atwood are supported on firm rock (to be verified by others).
5.  Subsurface material into which the soil nailing is to be installed is assumed to be weathered rock in the top 5-10 feet, grading to unweathered rock below the weathered zone (to be verified by others).
6.  A 1:1 slope is to be cut above the soil nail walls.  This slope is shown on the Schnabel plans for information only.  Responsibility for the design and adequacy of this slope is "by others."

In addition to the standard exclusions listed in the attached General Provisions, we specifically exclude the following:

a.  Layout of the wall line.
b.  Provisions for routing drainage from behind the wall locations.
c.  Wall finish other than rod finish.
d.  Excavation as required per our plans.
e.  Drainage V-ditch behind and above the soil nail walls.

3075 Citrus Circle, Suite 150, Walnut Creek, CA 94598; 510/947-1881, FAX 510/947-0418
**Atlanta ● Boston ● Chicago ● Denver ● Houston ● Philadelphia ● San Francisco ● Washington, D.C.**

Proposal for Mike Blatt's Residence 6/9/97, Page 2 of 4

PRICE:

Three Hundred Thirteen Thousand Six Hundred Dollars   ($313,600.00)

In addition to the monthly and final payment provisions listed in the attached GENERAL PROVISIONS, this proposal is based on the following additional provisions:

1. First payment of $35,000.00 upon signing of this Subcontract;

2. Second payment of $100,000.00 one (1) week prior to mobilizing;

3. Remaining monthly and final payments to be in accordance with the payment provisions of the attached GENERAL PROVISIONS.

For soil nailing quantities in excess of, or less than that indicated on Schnabel's drawings the following unit prices shall apply:

Add:        $58.00/SF
Deduct:     ($36.00/SF)

This proposal is based upon a normal five-day work week of eight (8) hours per day and one mobilization, unless noted otherwise in the Scope of Work above.

Additional Mobilization: $_____Cost plus 25%_____ per each.

If we are delayed due to man-made obstructions or "by others", the following rates shall apply:

Soil Nails:        $ 475_____ per hour per rig.

This offer to perform the stated work is based solely on this proposal and the attached GENERAL PROVISIONS, and no other document(s), and is valid for thirty (30) days from the above date.

ACCEPTED:                                    Respectfully submitted

Company:_____           SCHNABEL FOUNDATION COMPANY

Signature:_Mike O J. Blatt_____

Title:_owner_____

Witness:_____

K. Ronald Chapman, Vice President



# Schnabel

## FOUNDATION COMPANY

### GENERAL PROVISIONS

The Scope of Work and Prices detailed in this proposal are based upon all of the **GENERAL PROVISIONS** listed below:

**1. Coordination** - You shall coordinate the projects so that the work can proceed in an orderly, productive and continuous operation. For the items listed, the following will be provided to us free of charge: (A) <u>Soldier Beams</u>: excavation to the tops of the soldier beams shall be completed prior to the start of placing soldier beams; layout of the soldier beams; (B) <u>Lagging</u>: excavation to the back face of the lagging; (C) <u>Underpinning</u>: excavation to the top of the footing shall be completed prior to the start of underpinning work; (D) <u>Tiedowns</u>: the work surface shall be maintained firm and dry; (E) <u>Soil Nailing</u>: the excavation shall be made to within one (1) inch of the back of shotcrete line; (A-E) Additional work required due to over excavation shall be paid as an extra to Schnabel.

Additionally, we shall be provided free of charge: Excavation in approximately five (5) foot lifts, or less if the soil will not stand open; Rock excavation so as not to undermine or otherwise damage our work; A berm around the top of the excavation to prevent overtopping of the retention system by water or debris; Safe access for our personnel, equipment and concrete trucks moving under their own power to and from each work location; Access includes furnishing, placing and maintaining dry, level, firm benches (as specified in the Proposal), and ramps with mats, gravel or other surface materials as required, throughout the project. Benches are to be slightly sloped away from any work area, in order to prevent ponding of water, and are to be wide enough for safe operation of our personnel and equipment, and as specified in the **SCOPE OF WORK**.

**2. Temporary Service** - The following will be provided to us free of charge: 220-volt, 200-amp single phase, 110-volt, 40-amp electrical power, and water under normal city pressure, with all outlets and connections to be located within 200 feet of any work area; job toilets; watchmen services; space for a job trailer 10' x 40' in size; space for fabrication and storage of material to be used in job; spot grades and elevations around the job; and see **SCOPE OF WORK** for any additional services required.

**3. Plans and Permission** - For any Schnabel Foundation Company design, a detailed plan will be furnished, signed by a licensed engineer, showing the original plan on which this price is based. Changes will be made as you request, or as necessary to obtain approval of others, but if such changes result in changed costs, the price shall be adjusted accordingly. Permission to close portions of public space will be obtained by others, as will permission to do portions of this work, including tieback or soil nail installation, on adjacent private property.

**4. Labor** - We propose to do this job using union labor, and should labor trouble prevent us from completing this contract, we will be paid for the cost of all work performed to that time, plus a reasonable amount for overhead and profit.

**5. Utilities** - The following shall be performed "by others" prior to commencement of our work: power lines closer than legally permissible are to be removed, sheathed or de-energized; utilities along the shoring line are to be uncovered and located, then relocated, resupported or removed, as required to prevent interference with our work.

**6. Exclusions** - This price does not include any expense or work in connection with the following: excavation, (except for

underpinning); concrete (except for soldier beams and underpinning); collection and removal of debris and spoil (including shotcrete rebound) from any work location and the site; removal of : overhead or underground manmade obstructions, old footings and footing projections; backfill, tamping, restoration, line and grade work, monitoring, demolition, pumping and site dewatering (including pumping rain water); treated wood; fences, stairways, barricades and handrails; traffic control and flagmen; street cleaning; protection and maintenance of slopes, benches, berms and shoring; fees, permits, deposits, and bonds; liquidated and consequential damages; liability other than for our own negligence, and for negligence of our subcontractors; material testing and inspections other than per our design; removal of any of our work. See, **SCOPE OF WORK** for any additional exclusions.

**7. Change Orders** - Change orders will be in writing and subject to advance approval by Schnabel Foundation Company as to design and price before performing changed work. No back charges will be issued, nor accepted unless 72 hours notice in writing of a condition requiring correction is given with an additional and reasonable amount allowed for its correction.

**8. Insurance** - We will indemnify you for damages caused by our negligence. We will maintain the following insurance: a) Worker's Compensation - limits established by state law; b) Commercial General Liability in occurrence form - limits of $1.5 million (bodily injury and property damage combined per occurrence), $3 million (general aggregate), and $2 million (completed operations aggregate) including XCU hazards; c) Auto Liability - limits of $1.5 million each accident (single limit - bodily injury and property damage combined); d) Umbrella Excess Liability - limits of $1 million. Additional coverage and limits requested by you, if available, will be provided at cost.

**9. Payments** - Our price is based upon payments being made by you to us by the 10th of the following month for 90% (or more if stated in the specifications) of all work done the preceding month, including materials delivered to the site or stored in Schnabel's yard, irrespective of whether you have been paid for such work. Final payment to us, including all retainages, will be made by you to us 30 days after substantial completion of our work stated above, irrespective of whether or not you have been paid for such work. If there are later phases, such as ramp removal or other similar items to be completed at a later date, they shall be treated as separate jobs with an agreed to value withheld, and no other retention will be withheld. Interest at the rate of 1-1/2% per month, or the applicable legal maximum rate if more, shall accrue on all amounts not paid by the times provided above, and shall be paid by you to us monthly. Additional work performed by Schnabel shall be included in monthly progress estimates and paid monthly, without retention being withheld. No charges of any kind are to be made against Schnabel's account unless they are agreed to and signed by Schnabel Foundation Company. In the event any amount due as above provided is not paid when due and we commence legal proceedings to enforce payment, you shall be liable to us for all costs of any such legal proceedings, including reasonable attorney fees based on the time expended by our attorneys. If we are not paid within 30 days after the due dates as above provided , we may suspend work (without liability for damages resulting from suspension) until we have been paid in full for all amounts which have not been timely paid, including amounts coming due during such suspensions, and the cost of demobilization and remobilization.

**10. Acceptance** - This proposal may be accepted by your signature, or oral, or written notice to us, that you wish us to perform the work covered hereby, or by asking us to proceed with any part of the said work. Upon acceptance, a contract will exist incorporating the terms hereof. If you wish to use a different form of contract, then we would be pleased to negotiate a contract with terms consistent with proposal and other mutually agreeable terms.

1/93

# Schnabel

**FOUNDATION COMPANY**

| Atlanta | Boston | Chicago | Denver | Houston | Philadelphia | San Francisco | Washington,D.C. |
|---------|--------|---------|--------|---------|--------------|---------------|-----------------|
| 404/971-6455 | 603/622-8427 | 708/639-8640 | 303/696-7268 | 713/531-1103 | 215/277-2950 | 510/947-1881 | 301/657-3060 |

# EXHIBIT 3

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHT UPON YOU THE CERTIFICATE HOLDER. THIS CERTIFICATE IS NOT AN INSURANCE POLICY AND DOES NOT AMEND, EXTEND, OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED BELOW.

## This is to Certify that

SCHNABEL FOUNDATION COMPANY
45240 BUSINESS COURT, SUITE 250
STERLING, VIRGINIA 20166-6703
ATTN: NORMAN GARFIELD
(703) 742-0020

Name & address of Insured

Faxed to 415-331-9377 and mailed.
Supercedes Cert. dated 6-20-97

LIBERTY MUTUAL.

is, at the issue date of this certificate, insured by the Company under the policy(ies) listed below. The insurance afforded by the listed policy(ies) is subject to all their terms, exclusions and conditions and is not altered by any requirement, term or condition of any contract or other document with respect to which this certificate may be issued.

| TYPE OF POLICY | CERTIFICATE EXP. DATE | POLICY NUMBER | LIMIT OF LIABILITY | | |
|---|---|---|---|---|---|
| WORKERS COMPENSATION | ☐ CONTINUOUS ☐ EXTENDED ☒ POLICY TERM  4-1-98 | WC2-131-011670-607 | Coverage Afforded Under WC Law of the Following States: AL AZ AR CA CO CT DC DE FL GA ID IL IN IA KS KY LA  MD MA MI MN MS MO MT NE NH NJ NM NY NC  OK OR PA SC SD TN TX UT VT VA WI HI | EMPLOYERS LIABILITY Bodily Injury By Accident $500,000  Bodily Injury By Disease $500,000  Bodily Injury By Disease $500,000 | Each Accident  Policy Limit  Each Person |
| GENERAL LIABILITY ☐ CLAIMS MADE RETRO DATE ☒ OCCURRENCE | 4-1-98 | TB1-131-011670-397  INCLUDES: XCU COVERAGE CONTRACTURAL LIABILITY | General Aggregate-Other than Prod/Completed Operations $3,000,000 | Products/Completed Operations Aggregate $2,000,000 | |
| | | | Bodily Injury and Property Damage Liability $1,500,000 | Per Occurrence | |
| | | | Personal and Advertising Injury $1,500,000 | Per Person/ Organization | |
| | | | Other:$50,000 FIRE LEGAL LIABILITY | Other:$5,000 MEDICAL PAYMENTS | |
| AUTOMOBILE LIABILITY ☒ OWNED ☒ NON-OWNED ☒ HIRED | 4-1-98 | AS2-131-011670-407 | $1,500,000 | Each Accident - Single Limit - B. I. and P. D. Combined | |
| | | | | Each Person | |
| | | | | Each Accident or Occurrence | |
| | | | | Each Accident or Occurrence | |
| UMBRELLA EXCESS LIABILITY | 4-1-98 | TH1-131-011670-377 | $1,000,000 PER OCCURANCE FOR BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY OVER UNDERLYING LIMITS | | |
| CONTRACTORS EQUIPMENT | 4-1-98 | MS2-131-011670-317 | ALL LEASED OR HIRED EQUIPMENT LIMIT $500,000 DEDUCTIBLE $5,000 | | |

RE: SFC Job #9-2476, 435-445, & 476 Bridgeway, Sausalito, CA.  All liability policies shown above are endorsed to include Mike Blatt as an additional insured, as their interest(s) may appear.

IF THE CERTIFICATE EXPIRATION DATE IS CONTINUOUS OR EXTENDED TERM, YOU WILL BE NOTIFIED IF COVERAGE IS TERMINATED OR REDUCED BEFORE THE CERTIFICATE EXPIRATION DATE. HOWEVER, YOU WILL NOT BE NOTIFIED ANNUALLY OF THE CONTINUATION OF COVERAGE.

SPECIAL NOTICE- OHIO: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

NOTICE OF CANCELLATION: (NOT APPLICABLE UNLESS A NUMBER OF DAYS IS ENTERED BELOW.) BEFORE THE STATED EXPIRATION DATE THE COMPANY WILL NOT CANCEL OR REDUCE THE INSURANCE AFFORDED UNDER THE ABOVE POLICIES UNTIL UNTIL AT LEAST __30__ DAYS NOTICE OF SUCH CANCELLATION HAS BEEN MAILED TO:

Liberty Mutual Insurance Group

_AUTHORIZED REPRESENTATIVE_

June 20, 1997        FAIRFAX, VA
DATE ISSUED          OFFICE

| CERTIFICATE HOLDER | MIKE BLATT 5 MARION STREET SAUSALITO  CA  94365 |
|---|---|

This certificate is executed by LIBERTY MUTUAL INSURANCE GROUP as respects such insurance as is afforded by Those Companies.    BS 7729B

Exhibit C - p. 109

# EXHIBIT 4

**BLATT DEVELOPMENT OF NV INC.**
2777 NORHTTOWNE LANE
RENO, NV 89512

**Schwab**

450

3-5/310
150

DATE 8-30-4

PAY TO THE
ORDER OF _Alexander Angvik TRUST ACCOUNT_ $ 130,000

_One hundred thirty thousand and 00/100_ _____ DOLLARS

PNC BANK, N.A.
Philadelphia, PA

FOR _____

⑈031000053⑈ 70180729171⑈ 20450

---

**MICHAEL BLATT**
**CATHERINE E. BREMNER-BLATT**

**Schwab**

2238

3-5/310
150

DATE 8-31-04

PAY TO THE
ORDER OF _Alexander Angvik TRUST ACCOUNT_ $ 13,000

_Thirteen Thousand & 00/102_ _____ DOLLARS

PNC BANK, N.A.
Philadelphia, PA

FOR _____    Michael Blatt

⑈031000053⑈ 700958261 9⑈ 22238

John Rogue Jr
9-1-04

# EXHIBIT 5

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1   SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              COUNTY OF MARIN

3

4

5   JAMES GABBERT and MICHAEL
    LINCOLN,
6              Plaintiffs,

7   vs.                                    No.  CV 020477

8   MICHAEL BLATT; CATHERINE
    BLATT; PETER KANE and DOES
9   1-100 inclusive,
               Defendants.
10  _____/
          Deposition of
11    PAUL WEIR, VOLUME I

12  Friday, January 23, 2004

13

14

15

16

17

18

19  REPORTED BY:  JANET NOGARA, CSR #1218

20

21

22

23            NOGARA REPORTING SERVICE
           130 Battery Street, Suite 580
24         San Francisco, California 94111

25              (415) 398-1889

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    past were necessary solely because of a concern that

2    organisms, fungi or toxins were present that would

3    present a hazard to human health?

4         MR. ANOLIK:   That's been asked and answered.   That

5    was the question.

6         MS. GLASPY:   No, it hasn't been answered.

7         THE WITNESS:   My observation and review and

8    conversation with others regarding the conditions of

9    construction between the exterior wood framed wall at

10   the face of the concrete masonry unit walls and the

11   shotcrete walls at the rear of the building is such that

12   non-decay-resistant framing materials and sheeting may

13   be exposed to moisture and relative humidity in an

14   environment such that the conditions to support the

15   growth of fungus may exist in the future.   Those -- and

16   that location of that potential growth is in an area

17   that may communicate environmentally with the living

18   space, in which case airborne spores could potentially

19   be present in the environment during future occupancy.

20        MR. ANOLIK:   I take back my tried to get

21   stipulation that we would not be claiming different

22   things and at this point, we will see what the mold

23   specialists who have examined the place testified, but

24   that may be a problem of damages in the case.

25        MR. RYAN:   Q.   My question is still to you, sir,

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1   whether you have formed the opinion that there were

2   areas that either were repaired or in the future will

3   need to be repaired solely for the purpose of avoiding

4   conditions that would be hazardous to human health.

5       A.   It's my understanding that repairs have been

6   performed to improve the drainage conditions at the base

7   of the shotcrete walls that were discharging water into

8   the living spaces.  I understand that further repairs

9   have been made to wood framed walls in close proximity

10  to the shotcrete walls at the rear of the building.

11  Those repairs were performed to collect and dissipate

12  water and improve the ventilation between the shotcrete

13  wall and the wood framed walls in order to mitigate the

14  presence of moisture and high relative humidity that may

15  exist.

16      I believe the success of those repairs

17  regarding the required performance has not yet been

18  established.

19      Q.  Let me ask you this question:  I want you to

20  assume hypothetically that testimony develops at trial

21  that's essentially along these lines:  One expert says

22  it was necessary to repair some wood framing and another

23  expert says no, it's not, it was structurally adequate,

24  to which the counter is offered, well, it may still have

25  been structurally adequate, but it was a site for fungus

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1  Schnabel Foundation Company that may be Exhibit 54,

2  dated June 2nd, 1997, that relate to the construction

3  and installation of a shotcrete wall for 435 445 and

4  maybe 475 Bridgeway?

5       A.  What date was the drawing you referred to?

6       Q.  You can see them.  I believe they are June of

7  1997.

8       A.  June 2nd?

9       MR. RYAN:  Yes.

10      THE WITNESS:  This appears to be the same set of

11  documents.  Yes, I have reviewed those.

12          (Exhibit 119 marked for identification.)

13      MR. FOREMAN:  Q.  Same question.  Do you have any

14  opinions with respect to errors or omissions or quality

15  of drawings that were prepared by Schnabel Foundation

16  Company?

17      A.  Yes.

18      Q.  And what are your opinions with respect to the

19  Schnabel Foundation Company's drawings?

20      A.  In general, I believe they were adequate and

21  appropriate for the project.  I do have concerns

22  regarding the typical drainage strip detail that's

23  presented on Drawing No. 4.

24      Q.  And what is the criticism that you have on the

25  drawing on Page 4?

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1       A.  This particular detail indicates the drainage

2   that is to be installed behind the shotcrete wall and

3   the extension of that drainage medium to a perforated

4   pipe downhill of the shotcrete wall.  The detail

5   indicates that the drainage mat is to extend below the

6   adjacent concrete masonry wall.  And it's my opinion

7   that the concrete masonry unit or wall placed on that

8   drainage medium would impact the performance of the

9   drainage system and prevent discharge of water from

10  behind the shotcrete wall to the downhill collection and

11  dispersion system and would, in effect, trap water

12  behind the CMU wall.

13      Q.  Any other opinions with respect to the design

14  as shown on Page 4?

15      A.  I believe it would have been more appropriate

16  to include the perforated pipe in the subgrade

17  collection and dispersion system either behind the

18  shotcrete wall or behind the CMU wall.  Although, even

19  in that location, if it were perforated, water would

20  have an opportunity to discharge at the back face of the

21  CMU wall.  So in that location, it probably should have

22  been a closed drain.  In fact, even the line below the

23  slab as shown should possibly have been a closed line

24  rather than a perforated line.  Because the perforated

25  line allows water from the drainage mat to discharge

1   below the slab.

2       Q.   Any other criticisms?

3       A.   It's my understanding that the drainage system

4   uphill of the shotcrete wall is placed periodically,

5   basically at six feet on center, which allows the

6   possible migration of water through the shotcrete wall

7   at the intermediate on-drain spaces.  Consequently, I

8   think it may have been appropriate to have a moisture

9   barrier on the downhill side of the wall and additional

10  means to collect water at the interface between the CMU

11  Wall and the shotcrete wall.

12      Q.   Any other opinions with respect to the design?

13      A.   I believe those observations or comments cover

14  my opinions.

15      Q.   And I take it that those opinions are

16  criticisms of the Schnabel design?

17      A.   Yes.

18      Q.   Moving from design to construction, do you know

19  whether the drainage was constructed as designed in the

20  Schnabel drawings?

21      A.   Could you be specific with respect to what

22  elements and at what period of construction?

23      Q.   If I understand your opinion, your concern is

24  that the Schnabel design can trap water and it won't

25  discharge; is that correct, because of certain

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1  ~~deficiencies in the design?~~

2     ~~A.  Yes.~~

3     ~~Q.  What I'm asking is, if this had never been~~

4  ~~built, that was simply a hypothetical problem that this~~

5  ~~design could result in.  What I'm asking is, let's move~~

6  ~~away from the design, let's go out to the field.  Now~~

7  ~~the wall and the drainage is being constructed.  Have~~

8  ~~you done any investigation to determine whether the~~

9  ~~actual construction has any of the deficiencies that~~

10 ~~you've complained about that the design would engender?~~

11    ~~MR. RYAN:  I think his request, for clarification,~~

12 ~~has to do with the potential that, the way it looked at~~

13 ~~one point in time may have changed thereafter or, in~~

14 ~~other words, are you asking what it looked like, his~~

15 ~~understanding of what it was like when Schnabel got done~~

16 ~~and before anybody else proceeded?~~

17    ~~MR. FOREMAN:  Thank you for the clarification.~~

18    ~~MR. ANOLIK:  How come when he interrupts you thank~~

19 ~~him, and when I interrupt you get mad at me?~~

20    ~~MR. FOREMAN:  I don't get mad.  I just have to~~

21 ~~respond to the objections.~~  I never get mad at you, Al.

22    Q.  Do you have any knowledge of the condition of

23 the property at the time that the excavation was

24 completed by Hammond and prior to the installation of

25 the shotcrete wall by Schnabel as relates to the

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    drainage of the uphill side of the property?

2        A.  Yes.

3        Q.  What is your personal knowledge of the site?

4        A.  Photographs have been shown to me that document

5    the conditions at the time period that you refer to.

6    And those photographs indicate that the drainage system,

7    as illustrated on Sheet 4 of the Schnabel drawings,

8    appeared to have been in place at that time.

9        MR. RYAN:  In simple terms, the paradrain was

10   there.

11       MR. FOREMAN:  Q.  Do you have any personal

12   knowledge of what the condition of the site was after

13   the Schnabel wall was installed but prior to the Bray

14   construction of any of the building elements?

15       A.  I believe the construction was generally

16   consistent with the illustration of the drawing, Drawing

17   No. 4.

18       Q.  And do you have any personal knowledge of the

19   condition of the site after Bray did his construction

20   but prior to the time that Settgast went out and did a

21   manifold retro of the drainage system?

22       A.  From my understanding, clarification, that

23   would cover the time period between completion of the

24   Schnabel's work, up to the time of reconstruction by

25   Travis.  Is that correct?

1    Q.  Fair enough.  Now, within these segments that

2  we talked about, excavation, Schnabel, Bray, Travis, do

3  you have an opinion as to whether or not the drainage

4  system was constructed as designed by Schnabel

5  Foundation?

6    ~~MR. RYAN:  I'm going to object that that~~

7  ~~mischaracterizes the extent of affairs.~~

8    ~~MS. GLASPY:  It's making it more interesting~~

9  ~~though.~~

10        (Discussion off the record.)

11    THE WITNESS:  First of all, we need to qualify the

12  various conditions of relationships between the

13  shotcrete wall and the construction downhill.  There are

14  a variety of systems that differ from the detail

15  illustrated on Drawing No. 4, which is somewhat generic

16  in nature.  My observations on-site and review of

17  information, photographs, videos, reports prepared by

18  others, the downhill extension of the drainage system

19  installed by, apparently installed by Schnabel, does not

20  appear to exist downhill of the shotcrete wall.  Excuse

21  me, let me --

22    MR. FOREMAN:  Q.  I want you to assume -- go ahead.

23    A.  -- does not appear to exist downhill of the

24  shotcrete walls where the CMU walls do not exist, nor

25  downhill of the CMU walls where they are constructed

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1  adjacent to the shotcrete walls.

2      Q.  What I'm driving at is not necessarily who did

3  the hammer and chisel, that would be for someone else to

4  determine later.  All I'm trying to find out is, as this

5  thing was built in the field, do you know whether it

6  works or not, the drainage system?

7      A.  The drainage system, as constructed, does not

8  function and water is discharged into the building at

9  many different locations over the height of the

10 building.

11     Q.  Do you have an opinion as to who is responsible

12 for the non-functioning drainage system?

13     A.  Without referring to particular individuals, I

14 could refer to trades that may have been involved in the

15 subsequent construction to Schnabel.

16     Q.  What trades do you believe those to be?

17     A.  Concrete contractor, subcontractor, that would

18 have been involved in the construction of the foundation

19 systems, slab on grades, retaining walls, footings,

20 grade beams.  The subcontractor that constructed the CMU

21 walls, concrete masonry unit walls.  The general

22 contractor would have been involved in all of those

23 processes.

24         Individuals that placed the slab on grade may

25 have been a different subcontractor than the concrete

1    foundation subcontractor.  Individuals that placed

2    subgrade materials below the slab, including gravel,

3    sand, vapor barriers, steel reinforcing.  Framing

4    contractors in some instances where the framed walls are

5    immediately adjacent to the shotcrete walls.  And

6    depending on the contractual relationship between the

7    general contractor and subcontractors, there may have

8    been a specific subcontractor responsible for subgrade

9    drainage systems.

10       Q.  Why do you believe that those are the trades

11   that are responsible for the condition in the field that

12   you have offered an opinion on?

13       A.  Those are the systems, or those trades are

14   responsible for construction of the systems that are

15   immediately adjacent to the shotcrete wall.  And the

16   construction of those systems would have impacted or

17   been in contact with the extension of the drainage

18   system installed by Schnabel.

19       Q.  Do you know whether the problem that you've

20   identified here, this drainage water trapping problem,

21   has been remediated?

22       A.  A drainage system downhill of the CMU walls has

23   been installed to collect and divert water from behind

24   the CMU walls to a storm drain downhill of the property.

25       Q.  Do you have an opinion as to whether that new

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    system works to discharge the water from the uphill side

2    of the property?

3        A.  It's my understanding that the system is

4    performing reasonably well.  I'm not aware of studies

5    that have been made to determine the extent to which

6    it's successful or other conditions that may exist which

7    would demonstrate its success.

8        Q.  And the system that you are in reference to, is

9    this manifold system that was designed by Robert

10   Settgast where they drilled into the wall and put in

11   pipes to discharge water?

12       A.  Yes.

13       Q.  Are there any other issues or concerns relative

14   to the design that you are critical of or the trapping

15   of water or the discharge of water from the uphill side

16   as the condition exists today that you have not offered

17   an opinion on?

18       A.  Sorry, could you repeat that, please?

19       Q.  Sure.  Do you have any other opinions as to

20   whether there are any problems associated with the

21   Schnabel wall design or construction?

22       A.  By itself, independent of the systems downhill?

23       Q.  I want the whole enchilada.

24       A.  Perhaps you --

25       MR. RYAN:  Can we learn whether the whole enchilada

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    ~~two?~~

2        ~~A.   Drainage mat.~~

3        ~~Q.   Drainage mat.   Have you seen drainage mat used~~

4    ~~to drain behind soil nail type walls?~~

5        ~~A.   Yes.~~

6        Q.   What methods have you seen to hook up or to

7    dispose of the water carried out from behind the wall by

8    the drainage mat?

9        A.   Generally, the filter fabric that is part of

10   that assembly would extend beyond the supportive part of

11   the drainage mat and extend to a closed drain and wrap

12   around that drain, or a perforated drain, and discharge

13   or allow for the discharge of water into the perforated

14   drain to collect and disperse that water to a downhill

15   collection system.

16       Q.   Have you ever seen drainage mat incorporated in

17   some fashion such that it was allowing water to pass

18   through a poured-in-place concrete wall?

19       A.   I don't recall seeing that use of a mat in that

20   system.

21       Q.   The same question with respect to bringing it

22   through a CMU wall?

23       A.   Not where the materials, the vertical,

24   load-bearing materials would be in contact with the

25   drainage mat.

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1      Q.  Are you giving any consideration to the ability

2  of the materials used in that wall to span the drainage

3  mat?

4      A.  I'm sorry, would you read that back, please.

5          (Pending question read by Reporter.)

6      THE WITNESS:  Which materials are you referring to?

7      MR. RYAN:  Q.  A CMU unit, for instance.

8      A.  The CMU units, the base course would be set in

9  a grout bed, and that grout bed would impede the flow of

10 material, of water.

11     Q.  So I take it, you've never seen any sort of

12 system employed, be it something as simple as duct tape,

13 wrapped around the drainage mat in the area where it is

14 going to be encased in other building materials; true?

15     A.  I don't recall that particular use of duct

16 tape.  I think there are other ways to provide the

17 positive drainage that would avoid this type of problem.

18     Q.  Do you feel you have sufficient expertise and

19 experience and have done sufficient investigation into

20 the standard of practice of soil nail wall designers in

21 the Bay Area in the 1996-'97 time frame to be able to

22 testify as to whether Schnabel's design constituted

23 malpractice?

24     A.  The extent of the drainage system that we're

25 reviewing in this particular detail is beyond the

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    dimensions of the soil wall.  So my criticism is of the

2    use of the drainage material outside the boundaries of

3    the soil nail wall.  Whether it's adequate behind the

4    wall is a question for the geotechnical engineer to

5    address.  The use of the material and its placement,

6    function downhill of the wall is not related to the

7    design and detailing and construction of the soil wall

8    itself, in which case I do feel qualified to comment on

9    the use of those drainage materials.

10        Q.  So is it your testimony that Schnabel committed

11    malpractice in this detail?

12        A.  Not necessarily.

13        Q.  Somehow it seems to me as if I asked you if

14    Schnabel was pregnant, and you either are or you aren't.

15    Is it true as you sit here today that you are not

16    prepared to testify that Schnabel committed malpractice

17    in preparing that detail?

18        A.  I think the detail could be better and I think

19    it had limited ability to perform.  In the preparation

20    of that condition, whether that constitutes malpractice

21    or not, I would have to give some additional

22    consideration to.  I think the detail has limitations to

23    provide the necessary drainage that its intended to.

24        Q.  So is it true that as you sit here today, you

25    are not prepared to testify that Schnabel committed

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1   malpractice with respect to the design of this detail?

2       A.  At this time I would have to give that question

3   some additional consideration.  I am critical of the

4   detail.

5       Q.  I understand you are critical of the detail.

6   My question is simply whether you are currently prepared

7   to take the additional step beyond being critical of the

8   detail and opine that Schnabel committed malpractice in

9   the design of that detail.  Or would you need more

10  information to do that?

11      A.  I would have to give that consideration.

12      MR. RYAN:  Exhibit 121.

13      (Exhibit 121 marked for identification.)

14      MR. RYAN:  I'm going to show you what has been

15  marked as Exhibit 121, and I believe the parties have

16  agreed that the court reporter can white out the

17  brackets that appear in the left and right margins, two

18  sets on the first page of the exhibit and one set on the

19  second page of the exhibit, along with "EX D" written

20  the lower right hand corner.

21      Q.  Have you ever seen Exhibit 121 before?

22      A.  Yes.

23      Q.  Did you play any part in the preparation of

24  that exhibit?

25      A.  No.

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    ~~costs, that is not your area of expertise, you are not~~

2    ~~going to testify to that?~~

3       ~~A.  Right.~~

4       ~~Q.  Thank you.~~

5       ~~With respect to -- you were also asked a~~

6    ~~question about a Morfin letter, M-o-r-f-i-n, which was~~

7    ~~previously marked as Exhibit 16.  You said you didn't~~

8    ~~think you saw it or relied upon it.  I want to make~~

9    ~~certain that this letter was not in your mind's eye when~~

10   ~~you were answering the question (indicating.)~~

11      ~~A.  That's correct.~~

12      Q.  In your Exhibit 118 -- or is it 118?  You are

13   welcome to grab it -- you listed areas by systems.  And

14   you also talked about corrective work, and you

15   identified areas that you thought were not code

16   compliant and deficient in this 10-page list; correct?

17      A.  Yes.

18      Q.  Can you identify for me in Exhibit 118 where

19   there was damage to the property, physical damage to the

20   improvements that were brought about because that item

21   that you found was either deficient, not code compliant

22   or not built to plan?

23      A.  Yes.  Although I was -- as represented in

24   Exhibit 118, there are probably other documents that may

25   identify other conditions as well.

PAUL WEIR, VOL. I - FRIDAY, JANUARY 23, 2004

1    Q.  Shall we go through Exhibit 118?

2    A.  Sure (referring to document).  Grading

3  and drainage, surface drainage deficiencies, roof

4  drainage deficiencies, roof ventilation, retaining walls

5  without required drainage.

6           Under "foundations," retaining walls without

7  drainage, without moisture barrier, without

8  waterproofing, those conditions have resulted in

9  extensive water penetration and damages to finish

10  materials.  Grade beams at the front of the garage,

11  placement of steel without required cover.

12    Q.  Pardon me for one second.  Was water

13  penetration and water damage, back on retaining walls

14  without drainage, moisture barriers, you said water

15  penetration and one other term?

16    A.  Extensive water penetration has caused damage

17  to framing and finish materials.

18    Q.  I'm sorry, go on.

19    A.  Grade beams at the front of the garage,

20  placement of steel without required cover and incorrect

21  placement of steel has allowed for corrosion of the

22  steel.

23    Q.  When you said "allowed for corrosion," talking

24  about physical damage.  Did you actually see corrosion

25  on the steel.  Not what may occur in the future.  I'm

# EXHIBIT 6

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               IN AND FOR THE COUNTY OF MARIN

3                     ---oOo---

4

5    HON. LYNN DURYEE, JUDGE              DEPARTMENT NO. 7

6

7    JAMES GABBERT and MICHAEL            )

8    LINCOLN                             )

9                                        )

10                 Plaintiffs            )

11                                       )

12          vs.                          )    No. CV020477

13                                       )

14   MICHAEL BLATT, CATHERINE BLATT,     )

15   PETER KANE, and DOES 1 to 100,      )

16   inclusive                           )

17                                       )

18                 Defendants            )

19   _____)

20   AND RELATED CROSS-ACTION            )

21   _____)

22

23            REPORTER'S TRANSCRIPT OF PROCEEDINGS

24

25            TUESDAY, FEBRUARY 17, 2004

26

27

28   Reported By:  Deborah S. Bartunek, CSR 4822

1          (Whereupon, Plaintiffs' Exhibits

2          134, 135 and 136, previously marked

3               for identification, were received in

4          evidence.)

5          THE WITNESS:  134, 135, 136.  Basically what

6     we're looking at --

7          MR. FOREMAN: Without the notes, Your Honor.

8     The photographs I have no problem, but the witness has

9     his own handwritten notes on post-its.  Those can come

10    off.  Those are not the exhibits.

11          THE COURT:  True.

12          THE WITNESS:  What we're looking at is the

13    plywood shear wall that's in direct contact or

14    immediately adjacent to either a concrete block wall

15    that's on top of the shotcrete wall, or the shotcrete

16    immediately adjacent to the wood framing.

17          Holes have been cut in the plywood so you

18    can see that the -- that the plywood is only about a

19    half an inch away from the -- from the concrete wall.

20    Construction drawings require a minimum separation of

21    two inches.

22          You can also see now that there's a lack of

23    moisture barrier on the surface of the concrete.

24    There's also a lack of any weather protection on the

25    exterior face of the plywood.

26          Now, this picture illustrates --

27    BY MR. ANOLIK:

28          Q.   Refer to the number, please.

A.    136 and 134 illustrate the extent to which soil and grout have collected on the exterior face of the plywood, between the plywood and the concrete wall.

So here we see -- you see grout and concrete waste products, and soil, and organic matter that's piled up against the plywood.

Now if we look back at this picture we see the floor joists --

Q.    That is the picture on number 3?

A.    Yes.  We can see the magnitude of the collection of material.  The floor joists are two-by-six's at this location.  So what we have, this is the plywood that's sitting on the two-by-six, so by the time we get to this level we're up about eight inches. So now we have -- we have soil and concrete organic matter that's collected directly against the floor framing, as well.

So this material collects the water that is intended to migrate through that area to drainage systems.  It collects that water, allows water to stand and contact with the -- with the wood framing, and ultimately will lead to decay and deterioration of the framing.

And we have additional photographs that demonstrate the deterioration of the plywood sheeting.

Q.    How is that evident?

Asking that to be marked next for identification.

1          THE CLERK:  Plaintiffs' number 137 marked for

2     identification.

3          THE COURT:  Counsel seen 137?

4          MR. GOLDMAN: If it's --

5          MR. ANOLIK: Yes.

6          THE COURT:  They haven't seen it.  You need to

7     let him know.

8          MR. FOREMAN: Is that the photo from the bay

9     up?

10          MR. ANOLIK: Yes.

11          THE COURT:  No objection, Mr. Ryan?

12          MR. RYAN:  No.

13          THE COURT:  I'll receive it.

14                    (Whereupon, Plaintiffs' Exhibit No.

15                    137, a photograph, was marked for

16                    identification, and received in

17                    evidence.)

18     BY MR. ANOLIK:

19          Q.   Can you explain what these holes are, the wood

20     that has been cut away, the purpose of doing that, for

21     what the effect is?

22          A.   Exhibit 137 illustrates the exterior face of

23     the plywood that's exposed to the area -- to the cavity

24     between the wood framing and the concrete shotcrete, or

25     concrete masonry walls.  You can see the dark stains on

26     this panel is where concrete grout has collected and

27     stood right against the plywood.

28          In this particular case we see the dark

1    water stain that exists along the bottom.   And these are

2    areas where there's premature deterioration,

3    delamination of the plywood.   And the dark stains are

4    also indicative of the type of discoloration --

5         A JUROR:   We can't see.

6         THE WITNESS:   The dark stains are indicative

7    of the kinds of discoloration that's associated with --

8    with dry-rot.

9              So in these areas there's documentation of

10   soil and organic matter and concrete waste products that

11   are standing up to ten to twelve inches against --

12   against the plywood sheeting and the floor framing and

13   the wall framing.   These conditions were leading to

14   deterioration of the plywood sheeting and the floor

15   framing.

16   BY MR. ANOLIK:

17        Q.   Were you asked to also look into various

18   issues regarding the foundations of the two buildings?

19        A.   Yes.

20        Q.   And what did you discover in your

21   investigation?

22        A.   The foundations were investigated generally in

23   the garage area we can see indicated in board D, this is

24   a representation of the ground floor garage areas.   The

25   street is out here.   This is a common driveway.   Then

26   this is the slab on grade for the garage.   The area back

27   here is the area that we were looking at in these

28   photographs.

1    So now we're going to be looking at the

2    garage area and the conditions of construction

3    associated with the concrete and the continued migration

4    of water through the concrete walls. At this area,

5    looking at board 4, these are illustrations or

6    photographs that were made during the reconstruction

7    process either in the garage area along the walls here,

8    the walls here, or the elevator pits, which are in these

9    areas, and the walls along here which are really the

10   interior. These are the entry areas from the street to

11   the building.

12    Q.    What did you discover when you looked at that

13   area that you believe were structural defects?

14    A.    Okay.

15    Board 4 illustrates some of the water

16   migration that's existing. Here we see the dark stains

17   where water is migrating through the wall. Also the

18   white stains. The white stains are efflorescence.

19   That's a result of water migration through the concrete

20   which is collecting the soluble salts that are part of

21   the cement paste. Then when that material hits the

22   exterior face it crystallizes and results in the white

23   stains that we see.

24    In the event there is red, so these are

25   areas where we have water migration through the wall.

26   You can see the extent to which it exists.

27    MR. FOREMAN: Is there a question pending?

28    I'm sorry.

1    MR. ANOLIK: I was having him explain that

2    these are all from the video.

3    THE COURT: So the question -- so the question

4    is what?

5    MR. FOREMAN: I don't know.

6    THE COURT:  We need a question.

7    BY MR. ANOLIK:

8    Q.    The question is, what did you find when you

9    examined whether there were any defects with the

10   foundation.

11   A.    This is board 2 which further illustrates the

12   extent which water is migrating into the garage and

13   elevator pits.  Here we see water standing in the

14   elevator pit up to four inches deep.  Here's another

15   photograph that illustrates over 24 inches deep.  And in

16   one of the earlier photographs we see -- this

17   photograph, and this photograph -- here's the slab on

18   grade of the garage level.  And then we came up

19   approximately up into this area, 22 inches above the

20   slab on grade, then when that wall was punctured you can

21   see the extent to which water is flowing out of the --

22   out from behind the wall.

23          So there's actually hydrostatic head, or

24   standing water in excess of 22 inches above the slab on

25   grade.

26   THE CLERK:  Plaintiffs' exhibits 138 through

27   150 marked for identification.

28   THE COURT:  Counsel seen the pictures?

```
 1          MR. FOREMAN: No.  I want to make sure I know
 2    what we're talking about now.  We've got 25 of them
 3    here.
 4          THE COURT:  You have to show counsel the
 5    pictures before you have them marked.  I thought you
 6    were supposed to it before we got started today.
 7          MR. FOREMAN: These are from the video.  I have
 8    no objection.  I'm making certain they don't go in
 9    evidence with all the comments written on them.
10          MR. ANOLIK: Comments will be taken off.
11             Thank you.
12             Continue, Mr. Weir.
13          THE COURT:  Okay.  Group of exhibits will be
14    received.
15                    (Whereupon, Plaintiffs' Exhibits 138
16                     through 150, were marked for
17                     identification and received in
18                     evidence.)
19          THE WITNESS:  Okay.  So now we see the extent
20    of water migration that exists at this level of the
21    building.  Additionally,  as this water is migrating
22    through then you have additional water that's collecting
23    behind this wall at the lower levels of the building
24    then migrating into the garage and living spaces at the
25    lower level.
26          Looking at -- now at Exhibit 142.  Here's an
27    area where we see efflorescence, the white deposits.
28    Now we see a photograph taken from the similar area.
```

Now this one has red discoloration which is associated

with rust or corrosion produced -- probably associated

with corrosion of the steel in the -- in the concrete or

the concrete walls, or the concrete masonry walls.

            MR. FOREMAN: I'm sorry.  Which exhibit number

was that, please?

            THE WITNESS:  142.

BY MR. ANOLIK:

        Q.    What you see the actual steel oxidizing on the

inside, does that have an effect on the stability of the

concrete it's in?

        A.    Yes, it does.  And there will be considerable

deterioration associated with the corrosion of the

steel.  Reinforcing the -- the steel reinforcing

corrosion products occupy a volume of about eight times

the volume of the original steel reinforcing.  So when

you have a bar, that's the size of this pencil, become

ten times this size, it generates huge compressive

stresses on the -- on the surrounding concrete.  Results

in cracks in the concrete and ultimately deterioration

of the concrete.

            That process further exposes the steel to

additional and considerably more moisture and greater

cyclical deterioration.

        Q.    The concrete is pushed away from the steel

because of the rusting?

        A.    Yes.

        Q.    All right.  Thank you.

1    with layers of hot mopped tar, then a cap that's

2    resistant to the exposure to the environment.

3              What we had in this -- in these locations,

4    construction at these two buildings, we had first

5    placement of the hot mop, or the hot tar, directly on

6    the plywood, and then the placement of the first layer

7    of the membrane into that layer.  So any subsequent work

8    would be impossible.  If the building ever had to be

9    reroofed, that application of the hot mopped tar

10   directly on the plywood would necessitate removal of the

11   plywood at some future time.  And in addition, there are

12   flashing elements, angled flashing.

13        Q.   Can you explain what flashing is, at least in

14   a construction text?

15        A.   Wherever the wall -- the wall meets the

16   horizontal surface there has to be a sheet metal

17   element.  So the weather protection elements of the

18   building envelope on the wall extend down over the

19   vertical leg, and then the membrane or the roofing

20   material for the horizontal surfaces bond to the

21   horizontal leg.  Then any water that's on -- falls on

22   the wall, or the horizontal surface, is collected by

23   that flashing then diverted to a drain or a discharge

24   element through the exterior walls of the deck.

25        Q.   So without that would there be any probability

26   of increased water intrusion due to the elements of

27   where this house is?

28        A.   Yes, there would be.

1    Q.    Around the full outside of the unit you have

2    blue lines drawn for drainage and waterproofing

3    deficiencies.  What are those deficiencies as compared

4    to the ones we've already seen with the missing pipes?

5    A.    Uphill, or at the base of each of the

6    retaining walls at this level, and at this level, there

7    should be a drainage system.  We should have the weather

8    protection elements at the face of the concrete.  We

9    should have weather protection at the face of the wood

10    framed walls and we should have drainage elements,

11    horizontal drainage elements that extend around the

12    perimeter of the building.

13    And those horizontal elements are absent

14    along the entire uphill side of the building.  That was

15    what was contributing to the water that we see standing

16    on that horizontal shelf at this location.  So this is a

17    view, a plan view here, and what we're seeing, the blue

18    line, is the absent drainage that exists at this

19    location.

20    Q.    Considering how shallow from Bridgeway into

21    the mountain these units are, those x'd blue lines are

22    all drain -- standing water?

23    A.    Yes.  These are the areas of -- of the

24    horizontal shelf slab on grade where we have the floor

25    framing extending over these areas and we have water

26    migration at the base of the retaining walls migrating

27    over the horizontal surface and through the floor

28    framing, where the floor framing makes contact with the

1    it was -- it was a shelf in the -- in the original

2    design?

3         A.    Excuse me.  But I think board C is --

4    represents the roof, not the horizontal shelf.

5         Q.    Thank you.  There is a horizontal shelf that

6    you've talked about.  I'll find that drawing in a

7    moment, but there is horizontal shelf, right?

8         A.    Yes.

9         Q.    And you've been critical about the fact that

10   there's water on that horizontal shelf, light?

11        A.    Yes.

12        Q.    And there's a soil -- and a soil-nail wall

13   below the horizontal shelf, right?

14        A.    Yes.

15        Q.    If there's water ponding on that horizontal

16   shelf, is that a design issue because water could

17   accumulate and there was no provision made to get the

18   water off of that horizontal shelf?

19        A.    No.  It appears --

20             MR. ANOLIK: Beyond the scope.  We have haven't

21   gone after Schnabel.  He did not give any opinion as to

22   the Schnabel wall.  They're the ones who sued Schnabel.

23             MR. FOREMAN: I'm talking about Don Olsen's

24   design.

25             THE COURT:  It's overruled.  You can answer

26   the question.

27             THE WITNESS:  Would you repeat the question,

28   please.

BY MR. FOREMAN:

Q.    Sure.  My question to you is, do you have any criticism whatsoever, as you sit here today, of Don Olsen's design of the house?

A.    Some.

Q.    All right.  Do you have any criticisms of Schnabel, the soil-nail wall designer and installer?

A.    Some, yes.

Q.    Did you have any criticisms of **Hammond, the excavator who excavated the earth before the foundations were installed?

A.    No.

Q.    Do you have any criticisms of the foundation concrete subcontractor?

A.    Yes.

Q.    Do you have criticisms of the framer?

A.    Yes.

Q.    And do you have criticisms of the plumbers?
        You talked to Bill about that piping.

A.    Installation of the mechanical -- some mechanical systems.

Q.    All right.  So essentially every trade that was on this job you have a criticism of, right?

A.    Well, certainly the ones that I've been speaking of.

Q.    So even by accident no one got this job right, is that fair?

A.    I wouldn't go that far, but there are some

1    property as to whether or not it is built in a

2    constructively defective way?

3         A.    Could you rephrase that for me.

4         Q.    Did you read the deposition of Mr. Guy Travis?

5         A.    No.

6         Q.    Thank you.  I want you to assume

7    hypothetically that Guy Travis, the contractor for Mr.

8    Gabbert and Mr. Lincoln, testified he found no physical

9    damage to the property as a result of the moment frame

10   installation.

11         Does that testimony of the contractor for

12   Mr. Gabbert and Mr. Lincoln affect your opinion at all

13   with respect to the quality of construction at the job

14   site?

15         A.    No.

16         Q.    Okay.  I want you to further assume that Mr.

17   Travis testified that he found no physical damage to the

18   property as a result of any code violation.

19         Does the testimony of Mr. Travis, the

20   contractor for Mr. Gabbert and Mr. Lincoln, impact on

21   your testimony at all here today?

22         A.    Not with respect to that assumption.

23         Q.    Let me finally ask you whether -- assume

24   hypothetically that Mr. Travis testified that he found

25   no physical damage to the property as a result of any

26   deviation from plan.

27         Does that testimony of the contractor for

28   Mr. Gabbert and Mr. Lincoln impact on any of the

1    A.   The shotcrete portion?

2    Q.   Yes.

3    A.   Including the installation of the paradrain?

4    Q.   Not to the drainage yet.  Just the wall

5    portion of it was built as designed?

6    A.   Concrete only?

7    Q.   That's right.  These are the easy ones.

8    A.   Well, I just want to be sure that I'm

9    addressing the question properly.

10    Q.   Sure.

11    A.   Are you talking about vertically,

12    horizontally?  The change in elevations, as exactly

13    represented on the drawings, there are a number of

14    places where variation might take place without

15    compromising the performance.

16    Q.   All right.  What I'm really driving at, the

17    wall built, as constructed, was vertical here, it was

18    left open at this portion here, right, it was -- the

19    bottom of the wall meets this horizontal member here,

20    but there's nothing at the bottom, there's concrete then

21    there's building elements at this location, correct?

22    A.   I'm sorry.  I don't understand the question.

23    Q.   Let me show you poster board 3.

24         Behind this portion of the wall, this is the

25    horizontal shelf, correct?

26    A.   Yes.

27    Q.   All right.  And this is the framing of the

28    house, this is plywood shear, this is the back portion

1    of the house at this location here, right?

2         A.    Yes.

3         Q.    All right.   Then there's a gap behind this

4    wall, whether one inch or two inches, a gap behind this

5    wall, correct?

6         A.    In some instances -- some instances that void

7    is filled with concrete and soil.

8         Q.    Right.   That's the spoils from construction,

9    right?

10        A.    Generally, yes.

11        Q.    All right.   And then behind that wooden wall

12   which I've shown here we then come to what's been shown

13   in the picture before it, the soil-nail wall, right?

14        A.    Yes.   Although some areas might be the

15   concrete block wall.

16        Q.    Concrete block wall is down at this location

17   here, isn't it?

18        A.    Not entirely.

19        Q.    Okay.   And you're critical of the fact that

20   there's water that's coming out in this location here,

21   right?

22        A.    Yes.

23        Q.    And this horizontal section, although it was

24   removed and repaired, do you know whether it was built

25   as originally designed by Don Olsen, the architect?

26        A.    I'm sorry.   Did you say the horizontal shelf

27   was removed and replaced?

28        Q.    The framing members -- you showed us a

```
 1   STATE OF CALIFORNIA        )

 2                              )   SS.

 3   COUNTY OF MARIN            )

 4

 5

 6

 7        I, Deborah S. Bartunek, do hereby certify that I am

 8   an official court reporter of the Superior Court of the

 9   State of California, in and for the County of Marin, and

10   that as such I reported the proceedings had in the

11   above-entitled case, at the time and place set forth

12   herein;

13        That my stenotype notes were thereafter transcribed

14   into typewriting under my direction;

15        That the foregoing pages, numbered 1 through 160,

16   inclusive, constitute a full, true and correct

17   transcription of said notes.

18

19        Dated:  San Rafael, California, this 19th day of

20   February, 2004.

21

22            _Deborah S. Bartunek_

23              CSR 4822, Deborah S. Bartunek

24

25

26

27

28
```

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF MARIN

HON. LYNN DURYEE                              DEPARTMENT L

---oOo---

COPY

JAMES GABBERT, ET AL.,          )
                                )
                  Plaintiffs,   )
                                )
       vs.                      )        No. CIV020477
                                )
MICHAEL BLATT, ET AL.,          )
                                )
                  Defendants.   )
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

WEDNESDAY, FEBRUARY 18, 2004

VOLUME 2

PAGE 162 THROUGH 344


Reported By:
KIMBERLEE SCHROEDER, CSR, RPR
License No. 11414

1   A.    That one is.  The one to the right is not

2   nearly so long.

3   Q.    Do you know whether this is up on the shelf?

4   In other words, is this an area where there's a shelf?

5   A.    At the base of the wall, there appears to be

6   a horizontal shelf between the wall and the vertical

7   cut where the workers are visible.

8   Q.    So it's not possible to tell from this photo

9   how much material is actually left sticking out from

10  below the completed wall; is it?

11  A.    The base of the wall is not visible.  We

12  can't really tell.  It appears to be perhaps a couple

13  of feet.

14  Q.    Is it true that you don't know of anything

15  done by Schnabel in the construction of the shotcrete

16  and steel portion of its wall that is inconsistent

17  with what it was contractually obligated to do?

18  MR. FOREMAN:    Objection.  Are we talking

19  construction or design?

20  THE COURT:    Construction.  Overruled.

21  THE WITNESS:    I believe that's correct.

22  MR. RYAN:    Q.  And is it true you have no

23  reason to think that the Paradrain was not installed

24  behind its wall by Schnabel?

25  A.    It's my understanding from the drawings I've

26  reviewed that the Paradrain was installed on six-foot

27  intervals.

28  Q.    Now, turning from the construction that

KIMBERLEE SCHROEDER, RPR, CSR NO. 11414                    172

1    Schnabel did, as I understand it, you do have concerns

2    over the detail that Schnabel provided as a way to

3    hook up that drain, Exhibit B1.  You have a concern

4    with this Schnabel detail; correct?

5        A.    Yes.

6        Q.    That concern, fundamentally, you wonder

7    whether -- or you have a concern with the possibility

8    that when the new building wall gets constructed, it

9    might compromise the ability of the Paradrain to

10   transmit water?

11       A.    That's one of my concerns among others as

12   well.

13       Q.    If this system had been installed as per

14   that Schnabel detail without compromising the ability

15   of the Paradrain, then you would consider that to be

16   adequate; correct?

17       A.    No.    That's not correct.

18       Q.    What you indicated you would prefer to see

19   done in this location is to connect the Paradrain to a

20   tight line behind the new building wall; correct?

21       A.    In part, yes.

22       Q.    Now, this Schnabel detail bespeaks a perf

23   pipe.  What is meant by that?

24       A.    It's basically a plastic pipe with holes --

25   two rows of holes on one side of the pipe.

26       Q.    Does this drawing also indicate that under

27   the concrete of the garage floor slab there's to be a

28   bunch of gravel installed?

1   to one of your boards, namely number three, concerning

2   which you testified the other day and in particular to

3   the photo in the lower right.

4           What does this -- what area does this

5   depict?

6       A.   That's the rear wall of the garage at 445.

7       Q.   And is it your understanding that if the

8   Schnabel detail had been followed by the building

9   contractor that when this area was excavated, when the

10  garage slab was cut back, demolished, the gravel taken

11  out, so on and so forth, things dug down, people would

12  have been able to see the Paradrain coming from the

13  stem wall and hooking up to a pipe?

14      A.   Yes.

15      Q.   But the detail that you would prefer had

16  been followed, is it true that on demolishing in that

17  same fashion people would have seen nothing by way of

18  drainage?

19      A.   Possibly.  Although they wouldn't see the

20  amount of water.  If a drain line existed behind the

21  pipe as you're suggesting, we wouldn't see the amount

22  of water migrating into the building as currently

23  exists.

24      Q.   Are you familiar with Mr. Settgast's

25  as-built drawing?

26      A.   Yes.

27      Q.   That's Exhibit 7, I believe, in the book.

28          Going to the seventh tab, looking for

1  correct?

2      A.    Yes.

3      Q.    Is it true as far as you know that system is

4  working reasonably well?

5      A.    I believe it appeared to be working

6  reasonably well, although last -- just last week or a

7  couple of weeks ago continuing through today there is

8  significant water migrating into the building.

9      Q.    From where?

10     A.    Along the upper shelf at the base of the

11  shotcrete wall and the concrete slab on grade.

12     Q.    If that upper shelf area had been built by

13  the contractor as per the structural engineering, the

14  Olsen and the Schnabel plans, would it have been

15  adequate as far as you were concerned?

16     A.    I think there are still opportunities for

17  problems to develop, although it would have been a

18  significant improvement.

19     Q.    Page 56, line 10, through page 57, line 14,

20  question by Mr. Foreman:

21          "You were going to identify for us in the

22      drawings, as I understand it, and you were going

23      to identify whether it's Schnabel, engineering or

24      architectural drawings where this slab on drain

25      problem exists.

26          "Answer:  Yes.  The slab on drain, the

27      horizontal shelf between the offset shotcrete

28      walls as illustrated in the plan on sheet S4,

1  repairs.

2      Q.    Are you aware of there being any indication

3  in the plans anywhere that the shotcrete wall -- I'm

4  talking about the structural plans, the architectural

5  plans, and throw in the Sennabel plans.  Are you aware

6  of any place in any of those plans that indicate that

7  concrete masonry unit is to be founded on the

8  shotcrete wall?

9      A.    No.

10     Q.    I understand one of your criticisms in this

11  area above the shotcrete wall to be that drainage

12  wasn't installed?

13     A.    I'm sorry.  Above the shotcrete wall?

14     Q.    On the hill above the shotcrete wall was

15  there to be some sort of means installed to collect

16  the water that runs down that hill and diverted away

17  from the shotcrete wall and/or the structure?

18     A.    Yes.

19     Q.    Do I understand that you feel that wasn't

20  installed?

21     A.    That's correct.

22     Q.    How many times have you been up behind the

23  home to look at that hill?

24     A.    I believe twice.

25     Q.    While up there you were, as I understand it,

26  not aware there had been some additional improvements

27  made up here?

28     A.    Yes.

1  other words, we already discussed what it was that was

2  done per Settgast plan and looked at a photo; correct?

3      A.    Yes.

4      Q.    Put that aside a moment.

5          In addition, do you understand one of the

6  things done to deal with problems along the back wall

7  of the house was the use of some sort of preservative

8  spray applied to wood members back there?

9      A.    Yes.  In addition, there would be

10  improvements made to improve the collection of surface

11  water runoff uphill of the upper shotcrete wall.

12      Q.    Okay.  And then in addition to those three

13  things, improve the drainage on the hillside above,

14  install the Settgast, spray the walls, is it your

15  understanding efforts were made to improve

16  ventilation, air circulation through that space?

17      A.    Yes.

18      Q.    Is it true as you sit here today you can't

19  say one way or another any future repairs will be

20  necessary in that area?

21      A.    It's my belief -- and I've visited the

22  property three times in the last perhaps two to three

23  weeks, and there is significant water migrating into

24  the building at the level of the shelf.

25          And I've also taken moisture content

26  readings of the concrete wall.  There's significant

27  water migrating through the shotcrete wall.  I think

28  that additional repairs are required.

# EXHIBIT 7

Ronald J. Skocypec, Esq., Bar No.: 072690
Melodee A. Yee, Esq., Bar No.: 168541
PETERSON & BRADFORD, LLP
100 North First Street, Suite 300
Burbank, CA 91502
818.562.5800
818.562.5810 – Facsimile

Attorneys for Plaintiff
LIBERTY MUTUAL INSURANCE COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Liberty Mutual Insurance Company,<br><br>   Plaintiff,<br><br>vs.<br><br>Michael T. Blatt,<br><br>   Defendant. | ) Case No.:  C 06 2022 SC<br>)<br>) **DECLARATION OF MELODEE A. YEE**<br>) **IN SUPPORT OF LIBERTY MUTUAL**<br>) **INSURANCE COMPANY'S**<br>) **APPLICATION FOR DEFAULT**<br>) **JUDGMENT BY COURT**<br>)<br>) [Concurrently Filed With Application For<br>) Default Judgment By Court; Declaration Of<br>) Michael Barnette; Request For Judicial Notice;<br>) [Proposed] Order And [Proposed] Judgment]<br>)<br>) DATE:  August 25, 2006<br>) TIME:  10:00 A.M.<br>) DEPT.:  Ctrm 1, 17th Floor<br>)<br>)<br>)<br>) |

I, Melodee A. Yee, declare:

I am an attorney licensed to practice before the United States District Court for the Northern District of California, all courts in the State of California and am a member of the law firm of Peterson and Bradford, LLP, attorneys of record for plaintiff Liberty Mutual Insurance Company ("Liberty") in the instant action.  This declaration is filed in

1

support of Liberty's application for default judgment against defendant Michael Blatt. I have personal knowledge of the facts stated herein. If called and sworn as a witness, I could and would competently testify to the following:

1.    I have spent significant time reviewing and analyzing the attorney billings relating to the defense of Michael Blatt in the suit entitled <u>Gabbert v. Michael Blatt, et al.</u>, Marin County Superior Court, case no. 020477 (the "Gabbert Action") .    In reviewing these billing invoices, I have located the following charges which Liberty contends are not covered under its policy and which Liberty seeks reimbursement from defendant Blatt under <u>Buss v. Superior Ct.</u>, 16 Cal.4th 35 (1997) and <u>Scottsdale Ins. Co. v. MV Transportation,</u> 36 Cal. 4th 643 (2005).

2.    On the billing summary titled "Detail Slip Listing" dated July 9, 2003, attached as Exhibit "2" to the concurrently filed declaration of Michael Barnette, at pages 11-14, there are a total of eight (8) listings, totaling $688.50, which reference legal work solely attributable to the pursuit of defendant Michael Blatt's cross-complaint in the Gabbert Action. These defense fees are marked by a <u>single underline</u>.

3.    On the billing summary titled "Detail Slip Listing" dated July 9, 2003, attached as Exhibit "2" to the concurrently filed declaration of Michael Barnette, at pages 13-17, 21, 23, and 27-29, there are a total of seventeen (17) listings, totaling $1296.00, which reference legal work solely attributable to defendant Michael Blatt's pursuit of insurance coverage for the Gabbert Action. These defense fees are marked by a <u>double underline</u>.

4.    On the billing statements dated March 1, 2004 though July 16, 2004, attached as Exhibit "2" to the concurrently filed declaration of Michael Barnette, at

2

pages 46-49, 51-53, and 55-56, there are numerous entries, totaling $13,121.63, which reference legal work performed after February 28, 2004, after the defense verdict was issued in Schnabel's favor in the Gabbert Action.  These defense fees are circled.

5.    A few redactions on these bills were made out of an abundance of caution in order to protect any attorney-client privilege which may exist with respect to these bills in compliance with Clarke v. American Commerce National Bank (9th Cir. 1992) 974 F.2d 127, 129.

6.    Defendant Michael Blatt was properly served in this action yet has not appeared in this action.  At no time has our office been contacted by Mr. Blatt or a representative of Mr. Blatt during the pendency of this declaratory relief action.

I declare under the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on July 21, 2006, in Burbank, California.

MELODEE A. YEE

# EXHIBIT 8

1  Ronald D. Foreman, Esq.  (SB No. 061148)
   Jacqueline C. Hamilton, Esq.  (SB 187732)
2  **FOREMAN & BRASSO**
   807 Montgomery Street
3  San Francisco, CA 94133
   (415) 433-3475
4  (415) 781-8030 fax

5  Attorneys for Defendants
   Michael Blatt and Catherine Blatt
6

7

FILED

APR 3 0 2002

JOHN P. MONTGOMERY,
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: S. McConnell, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 COUNTY OF MARIN – UNLIMITED JURISDICTION

10  JAMES GABBERT AND MICHAEL           )    CASE NO. CV 020477
    LINCOLN,                            )
11                                      )    **CROSS-COMPLAINT FOR DAMAGES**
           Plaintiffs,                  )    **AND DECLARATORY RELIEF**
12                                      )
         v.                             )
13                                      )
                                        )
14  MICHAEL BLATT, CATHERINE            )
    BLATT, PETER KANE and DOES 1-100,   )
15  inclusive,                          )
                                        )
16         Defendants.                  )
                                        )
17  _____   )
                                        )
18                                      )
    MICHAEL BLATT, and CATHERINE        )
19  BLATT                               )
                                        )
20       Cross-Complainants,            )
                                        )
21       v.                             )
                                        )
22  JAMES GABBERT, MICHAEL              )
    LINCOLN, TRAVIS BUILDERS, INC.,     )
23  SCHNABEL FOUNDATION                 )
    COMPANY, HAROLD JOHN BRAY, JR.      )
24  dba H BRAY CONSTRUCTION,            )
    CHRISTOPHER H. HAMMOND dba          )
25  HAMMOND CONSTRUCTION,               )
    JOHANN KLEMENZ STOCKLIN dba         )
26  STOCKLIN IRON & CONST, and ROES     )
    1 THROUGH 50, inclusive,            )
27                                      )
         Cross-Defendants.              )
28

CROSS-COMPLAINT FOR DAMAGES                        - 1 -

1    Defendants and Cross-complainants, MICHAEL BLATT and CATHERINE

2  BLATT ("Cross-complainants" or "the Blatts") allege as follows:

3        1.     Cross-complainants MICHAEL BLATT and CATHERINE BLATT are residents of

4  Marin County, California.

5        2.     Cross-defendants JAMES GABBERT ("Gabbert") and MICHAEL LINCOLN

6  ("Lincoln") are residents of Marin County, California.

7        3.     Cross-defendant TRAVIS BUILDERS, INC. ("Travis Builders") is a corporation

8  doing business in Marin County, California.

9        4.     Cross-defendant SCHNABEL FOUNDATION COMPANY ("Schnabel

10  Foundation") is a corporation doing business in Marin County, California.

11       5.     Cross-defendant HAROLD JOHN BRAY, JR. ("Bray") doing business as H BRAY'

12  CONSTRUCTION is a sole proprietor doing business in Marin County, California.

13       6.     Cross-defendant CHRISTOPHER H. HAMMOND ("Hammond") doing business as

14  HAMMOND CONSTRUCTION is a sole proprietorship doing business in Marin County, California.

15       7.     Cross-defendant JOHANN KLEMENZ STOCKLIN ("Stocklin") doing business as

16  STOCKLIN IRON & CONST, is a sole proprietor doing business in Marin County California.

17       8.     All contracts alleged herein were entered into in Marin County, California.

18       9.     Damages prayed for herein are within the jurisdiction of this Court.

19       10.    Cross-complainants are ignorant of the true names and capacities of Cross-

20  defendants sued herein as Roes 1 through 50, inclusive, and therefore sues said Cross-defendants by

21  such fictitious names.  Cross-complainants will amend this complaint to allege their true names and

22  capacities when ascertained.

23       11.    Cross-complainants are informed and believe and thereon alleges that at all times

24  herein mentioned each of the Cross-defendants and their predecessors-in-interest was the agent and

25  employee of each of the remaining Cross-defendants or their predecessors-in-interest, and that in

26  doing the things hereafter alleged, were acting within the course and scope of such agency and

27  employment.

28

1         12.     On September 29, 1998, Cross-complainants entered into an agreement (hereinafter

2    "Purchase Agreement") to sell Cross-defendant Gabbert the real property located at 445 Bridgeway,

3    Sausalito, Marin County, California. 445 Bridgeway was also know as "Casa Splendido." The

4    agreement had an effective date of September 24, 1998. The broker for Cross-complainants, was

5    Douglas Ferguson.

6         13.     The Purchase Agreement provides in paragraph 13 as follows:

7    **CONDITION OF PROPERTY**: The property is warranted by Seller
     against defective material and workmanship for a period of one (1)
8    year from date of occupancy. All material and subcontractor
     warranties will be assigned to Buyer. The warranty will apply as to
9    any particular defect only in the event written notice of such defect is
     received by Seller within one (1) year warranty period. Seller reserves
10   the right to repair or replace any defect in the property. Repair or
     replacement of a defect will be undertaken as promptly as possible
11   under the circumstances, but in no event will Seller be liable for any
     special or consequential damages. This warranty does not apply to (a)
12   chips, breakage and missing items which were inspected and accepted
     during the punch list tour or afterwards; (b) minor settling cracks,
13   normal to home construction, (c) wear and tear arising out of
     occupancy of the property by Buyer, (d) damage caused by alterations
14   or additions made by others or (e) damage caused by movers.

15        14.     On the same day, September 29, 1998, the Purchase Agreement was modified by an

16   Addendum. The Addendum provides, in part:

17   2. Subject to possible adjustment by the parties [the Blatts and Gabbert] pursuant to
     paragraph 3 below, the purchase price shall be either:
18
     (a) $2,400,000.00 if both this purchase [445 Bridgeway] and the
19   purchase of the adjacent condominium unit (435 Bridgeway) by
     Michael P. Lincoln, are agreed to by Seller [the Blatts] and hereafter
20   close concurrently; or

21   (b) $2,500,000.00 if this purchase closes but the adjacent
     condominium unit [435 Bridgeway] is not concurrently purchased by
22   Michael P. Lincoln.

23        15.     The Purchase Agreement included a list of change orders for the construction of 445

24   Bridgeway. The real properties at 435 and 445 Bridgeway were sold during construction and were

25   not complete at the time of entering into the Purchase Agreement.

26        16.     Cross-complainants allege on information and belief that on September 29, 1998,

27   Cross-complainants entered into a Purchase Agreement with Cross-defendant Lincoln for the

28

---

CROSS-COMPLAINT FOR DAMAGES

- 3 -

1    purchase and sale of the real property located at 435 Bridgeway, Sausalito, Marin County,

2    California. Cross-complainants allege on information and belief that the Purchase Agreement

3    essentially mirrored the Purchase Agreement entered into by Cross-complainants and Cross-

4    defendant Gabbert.

5        17.    On or about February 22, 1999, Cross-complainants and Cross-defendant Gabbert

6    entered into a First amendment to the Residential Purchase Agreement. By the terms of this

7    Amendment to the Residential Purchase Agreement for 445 Bridgeway, it was agreed that Cross-

8    defendant Gabbert would complete the incomplete construction of 445 Bridgeway and that Cross-

9    defendant Gabbert accepted responsibility for the completion of the improvements at 445 Bridgeway.

10   The purchase price was further reduced by $178,556.84 to a new price of $2,221,443.16.

11       18.    On February 22, 1999, Cross-complainants and Cross-defendant Lincoln entered into

12   a First Amendment to Residential Purchase Agreement for 435 Bridgeway. The First Amendment to

13   the Residential Purchase Agreement mirrored the First Amendment to the Residential Purchase

14   Agreement between Cross-complainants and Cross-defendant Gabbert.

15                   **FIRST CAUSE OF ACTION**

16           (Breach of Contract Against James Gabbert and Michael P. Lincoln)

17       19.    Cross-complainants incorporate herein by reference paragraphs 1 through 18 as

18   through fully stated herein.

19       20.    On or about September 29, 1998, Cross-complainants and Cross-defendants Gabbert

20   and Lincoln entered into a written contract (Purchase Agreement) for the purchase, sale and

21   completion of construction of condominium units located 435 and 445 Bridgeway Avenue. Pursuant

22   to the terms of said Purchase Agreements, Cross-complainants were to provide work, labor,

23   materials and supplies necessary to complete the work of construction for a total price of

24   $2,400,000.

25       21.    In the course of said construction and by virtue of the terms of the contract, the

26   parties agreed to modify the same so that Cross-defendants Gabbert and Lincoln assumed the

27   responsibility of completing the works of construction. The contract documents were modified

28

---

CROSS-COMPLAINT FOR DAMAGES

1  accordingly. Cross-complainants allege on information and belief that substantial changes were made

2  to the original design specifications for 435 and 445 Bridgeway.

3      22.     Pursuant to the terms of the contract, paragraph 13, Condition of the Property,

4          Cross-

5  defendants Gabbert and Lincoln were to notify Cross-complainants of any issues regarding the

6  construction and provide Cross-complainants with an opportunity to cure the same.

7      23.     Cross-defendants Gabbert and Lincoln failed and refused to permit Cross-

8  complainants to cure any alleged defects. Such failure and refusal of Cross-defendants Gabbert and

9  Lincoln constitutes a breach of the Purchase Agreement. By breaching the Purchase Agreement,

10  Cross-defendants Gabbert and Lincoln are barred from claiming damages by its terms.

11      24.     Cross-complainants performed all conditions, covenants, and promises required on

12  their part to be performed in accordance with the terms and conditions of the Purchase Agreement.

13      25.     As a direct and proximate result of Cross-defendants Gabbert and Lincoln breach of

14  the Purchase Agreement, Cross-complainants have been damages in amounts according to proof.

15      WHEREFORE, Cross-complainants pray for damages hereinafter set forth.

16                          **SECOND CAUSE OF ACTION**

17      (Negligence Against James Gabbert, Michael Lincoln, and Travis Builders, Inc.)

18      26.     Cross-complainants incorporate herein by reference paragraphs 1 through 25 as

19  through fully stated herein.

20      27.     Cross-complainants allege on information and belief that Cross-defendants Gabbert

21  and Lincoln hired Cross-defendant Travis Builders, Inc. to complete the work in progress at 435 and

22  445 Bridgeway.

23      28.     Cross-complaints allege that Cross-defendant Travis Builders, Inc. is the agent of

24  Cross-defendants Gabbert and Lincoln. Cross-complainants allege that Cross-defendants Gabbert

25  and Lincoln are responsible for any improper construction to 435 and 445 Bridgeway caused by

26  Cross-defendant Travis Builders, Inc.

27      29.     Cross-complainants allege that Cross-defendants Gabbert, Lincoln, and Travis

28

---

CROSS-COMPLAINT FOR DAMAGES

1  Builders, Inc. breached their duty of care to Cross-complainants and failed to exercise reasonable

2  care in that they failed to properly and adequately supervise, inspect, investigate, prepare, modify,

3  alter, or construct any alterations or additions made to the condominium units located at 435 and 445

4  Bridgeway and that the improvements were not of the quality commensurate with the value of the

5  property nor were they fit for the particular purpose for which they were designed and/or were not

6  free of defects which would not adversely affect the safety or merchantability of the property. Cross-

7  complainants also allege that Cross-defendants Gabbert, Lincoln, and Travis Builders, Inc. made

8  substantial changes to the original design specifications. Cross-complainants also allege that Cross-

9  defendants Gabbert, Lincoln, and Travis Builders, Inc. failed to monitor the expenses and costs of

10  repairs to 435 and 445 Bridgeway and as a result, the costs for completing the construction have

11  grown exponentially.

12      30.    As a direct and proximate and legal result of the negligence of Cross-defendants

13  Gabbert, Lincoln, and Travis Builders, Inc. the works of improvement are defective in an amount not

14  yet fully ascertainable but proof of which will be offered at trial.

15      31.    As a further, direct and proximate result of the negligence of Cross-defendants

16  Gabbert, Lincoln, and Travis Builders, Inc., Cross-complainants will incur or have incurred repair

17  loss, legal expenses and other costs of inspection and/or reports in an amount not yet fully

18  ascertainable but proof of which will be offered at trial. Cross-complainants are informed and believe

19  that the sum exceeds the amount of $25,000. Cross-complainants will seek leave of court to amend

20  this cross-complaint to add such sums as they become known.

21      WHEREFORE, Cross-complainants pray for damages hereinafter set forth.

22              **THIRD CAUSE OF ACTION**

23      (Declaratory Relief Against Schnabel Foundation Company, Harold John Bray, Christopher
        Hammond, and Johann Stocklin)

24

25      32.    Cross-complainants incorporate herein by reference paragraphs 1 through 31 as

26  through fully stated herein.

27      33.    As part of its written subcontract with Cross-complainants, Cross-defendants

28

---
CROSS-COMPLAINT FOR DAMAGES                              - 6 -

1  Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin entered into an

2  indemnity agreement with Cross-complainants under which Cross-defendants Schnabel Foundation,

3  Harold John Bray, Christopher Hammond, and Johann Stocklin expressly agreed to indemnify and

4  keep harmless Cross-complainants from any claims, damages, losses and expenses arising from or

5  related in any manner to work Cross-defendants Schnabel Foundation, Harold John Bray,

6  Christopher Hammond, and Johann Stocklin did at 435 Bridgeway and 445 Bridgeway.

7       34.     In or about March 2002, Cross-complainants gave Cross-defendants Schnabel

8  Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin notice of the action

9  brought by Plaintiffs Gabbert and Lincoln and demanded defense and indemnity.  To date, Cross-

10  defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin

11  have refused Cross-complainants' tender.

12       35.     An actual controversy has arisen and now exists between Cross-complainants and

13  Cross-defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann

14  Stocklin in that Cross-complainants contend, and Cross-defendants Schnabel Foundation, Harold

15  John Bray, Christopher Hammond, and Johann Stocklin deny, the following:

16          a.    That, as between Cross-complainants and Cross-defendants Schnabel

17              Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin,

18              responsibility, if any, for damages claimed by Plaintiffs rests on Cross-

19              defendants Schnabel Foundation, Harold John Bray, Christopher Hammond,

20              and Johann Stocklin; and

21          b.    That, as a result, Cross-defendants Schnabel Foundation, Harold John Bray,

22              Christopher Hammond, and Johann Stocklin is obligated to indemnify and

23              keep harmless Cross-complainants from any sums or expenses that Cross-

24              complainants may incur or be compelled to pay as the result of any claims,

25              damages, judgment, or award recovered by Plaintiffs against Cross-

26              complainants.

27       36.     Cross-complainants desire a judicial determination of the respective rights and

28

CROSS-COMPLAINT FOR DAMAGES

1  duties of Cross-complainants and Cross-defendants Schnabel Foundation, Harold John Bray,

2  Christopher Hammond, and Johann Stocklin with respect to the damages claim by Plaintiffs herein.

3  Specifically, Cross-complainants desire a declaration, if Plaintiffs' complaint is found to have merit,

4  that Cross-defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann

5  Stocklin is responsible to expressly indemnify Cross-complainants for any such sums that Cross-

6  complainants may be compelled to pay or cost that it incurs because of the work by Cross-defendants

7  Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin or for which

8  Cross-defendant Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann

9  Stocklin are determined to be responsible, entirely or in part.

10      37.    Such a declaration is necessary and appropriate at this time in order that

11  may ascertain its rights and duties with respect to the complaint by Plaintiffs.  Furthermore, the

12  complaint of Plaintiffs and this cross-complaint by the Blatts arises out of the same event and

13  transaction, and the determination of both in one proceeding is necessary and appropriate to avoid a

14  multiplicity of actions that would result if Cross-complainants are required now to defend Plaintiffs'

15  complaint and then to bring a separate action for indemnity against Cross-defendants Schnabel

16  Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin for sums that Cross-

17  complainants may be compelled to pay to Plaintiffs as a result of any damages, judgment, or award

18  recovered by Plaintiffs against Cross-complainants.

19      WHEREFORE, Cross-complainants pray for judgment as set forth below.

20  ### FOURTH CAUSE OF ACTION

21  (Express Indemnity Against Schnabel Foundation Company, Harold John Bray, Christopher
22  Hammond, and Johann Stocklin)

23      38.    Cross-complainants incorporate herein by reference paragraphs 1 through 37 as

24  through fully stated herein.

25      39.    As part of its written subcontract with Cross-complainants, Cross-defendants

26  Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin entered into an

27  indemnity agreement with Cross-complainants under which Cross-defendants Schnabel Foundation,

28

---

CROSS-COMPLAINT FOR DAMAGES

- 8 -

1    Harold John Bray, Christopher Hammond, and Johann Stocklin expressly agreed to indemnify and

2    keep harmless Cross-complainants from any claims, damages, losses and expenses arising from or

3    related in any manner to work Cross-defendants Schnabel Foundation, Harold John Bray,

4    Christopher Hammond, and Johann Stocklin did at 435 Bridgeway and 445 Bridgeway.

5        40.    On or about January 29, 2002, Plaintiffs Gabbert and Lincoln brought an action

6    against Cross-complainants herein to recover damages for the alleged failure to deliver 435 and 445

7    Bridgeway to Plaintiffs as required by the Purchase Agreement. Plaintiffs allege, among other things,

8    that 435 and 445 Bridgeway had the following defects: Required hold-downs were missing from the

9    elevator shaft as was required shear wall; walls were missing sill plate and were not built to plan;

10   steel beaming used that failed to comply with design plans; through bolts were missing as was wood

11   beam packing; steel beams were not correctly packed; welded bolts were used instead of through

12   bolts; hold-down straps for shear to beam attachment missing; excess plywood packing causing

13   "speedbumps"; missing beam bolts; improper stair risers; shear walls incorrectly connected to joist

14   blocking; garage walls not built to plans but built too low; no foundations installed as required in

15   plans; tie downs incorrectly installed; missing deck flashing; missing ceiling vents roof showed signs

16   of failure; improper number of roof drains; vapor barriers missing; insufficient drainage because of

17   the lack of exit routes; stair cases did not meet code requirements; fire sprinkler system failed to meet

18   code and other defects unknown at this time.

19       41.    In or about March 2002, Cross-complainants gave Cross-defendants Schnabel

20   Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin notice of the action

21   brought by Plaintiffs Gabbert and Lincoln and demanded defense and indemnity. To date, Cross-

22   defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin

23   have refused Cross-complainants' tender.

24       42.    Cross-complainants have performed all the conditions and obligations to be

25   performed on their part under their with Cross-defendants Schnabel Foundation, Harold John Bray,

26   Christopher Hammond, and Johann Stocklin.

27       43.    By reason of the foregoing, Cross-complainant is entitled to be indemnified by

28

CROSS-COMPLAINT FOR DAMAGES                              - 9 -

1  Cross-defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann

2  Stocklin in an amount to be proven at trial if Plaintiffs' are successful on their complaint.

3       44.    In defending this action Cross-complainants necessarily and reasonably will and have

4  incurred and paid attorney's fees and other legal costs to be proven at trial.

5       WHEREFORE, Cross-complainants pray for damages hereinafter set forth.

6                              **FIFTH CAUSE OF ACTION**

7  (Implied Contractual Indemnity Against Schnabel Foundation Company, Harold John Bray,
                    Christopher Hammond, and Johann Stocklin)
8

9       45.    Cross-complainants incorporate herein by reference paragraphs 1 through 44 as

10  through fully stated herein.

11      46.    Beginning in 1997, Cross-complainants and Cross-defendants Schnabel Foundation,

12  Harold John Bray, Christopher Hammond, and Johann Stocklin entered into written contracts

13  whereby Cross-defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and

14  Johann Stocklin agreed to supply certain work to be constructed at 435 and 445 Bridgeway.

15      47.    On or about January 29, 2002, Plaintiffs Gabbert and Lincoln brought an action

16  against Cross-complainants herein to recover damages for the alleged failure to deliver 435 and 445

17  Bridgeway to Plaintiffs as required by the Purchase Agreement.  Plaintiffs allege, among other things,

18  that 435 and 444 Bridgeway had the following defects:  Required hold-downs were missing from the

19  elevator shaft as was required shear wall; walls were missing sill plate and were not built to plan;

20  steel beaming used that failed to comply with design plans; through bolts were missing as was wood

21  beam packing; steel beams were not correctly packed; welded bolts were used instead of through

22  bolts; hold-down straps for shear to beam attachment missing; excess plywood packing causing

23  "speedbumps"; missing beam bolts; improper stair risers; shear walls incorrectly connected to joist

24  blocking; garage walls not built to plans but built too low; no foundations installed as required in

25  plans; tie downs incorrectly installed; missing deck flashing; missing ceiling vents roof showed signs

26  of failure; improper number of roof drains; vapor barriers missing; insufficient drainage because of

27  the lack of exit routes; stair cases did not meet code requirements; fire sprinkler system failed to meet

28

1   code and other defects unknown at this time.

2       48.    Cross-complainants are informed and believe and therefore allege that any

3   construction defects proved by Plaintiffs are not the fault of Cross-complainants but are the faults of

4   others who performed work on 435 Bridgeway and 445 Bridgeway, including Cross-defendants

5   Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin.

6       49.    The damages recovered by Plaintiffs, if any, against Cross-complainants will be

7   caused primarily and ultimately by Cross-defendants Schnabel Foundation, Harold John Bray,

8   Christopher Hammond, and Johann Stocklin's breach of their contract with Cross-complainants.

9   Cross-complainant's liability for these damages arose, not as a result of any actual fault on their part,

10  but solely by operation of law, arising from imputed liability.

11      50.    In or about March 2002, Cross-complainants gave Cross-defendants Schnabel

12  Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin notice of the action

13  brought by Plaintiffs Gabbert and Lincoln and demanded defense and indemnity.  To date, Cross-

14  defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin

15  have refused Cross-complainants' tender.

16      51.    By reason of the foregoing, Cross-complainants are entitled to indemnity from Cross-

17  defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin in

18  an amount to be proven at trial.

19      WHEREFORE, Cross-complainants pray for damages hereinafter set forth.

20                             **SIXTH CAUSE OF ACTION**

21  (Equitable Indemnification Against Schnabel Foundation Company, Harold John Bray, Christopher

22  Hammond, and Johann Stocklin)

23      52.    Cross-complainants incorporate herein by reference paragraphs 1 through 51 as

24  through fully stated herein.

25      53.    Beginning in 1997, Cross-complainants and Cross-defendants Schnabel Foundation,

26  Harold John Bray, Christopher Hammond, and Johann Stocklin entered into written contracts

27  whereby Cross-defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and

28

1   Johann Stocklin agreed to supply certain work to be constructed at 435 and 445 Bridgeway.

2       54.     On or about January 29, 2002, Plaintiffs Gabbert and Lincoln brought an action

3   against Cross-complainants herein to recover damages for the alleged failure to deliver 435 and 445

4   Bridgeway to Plaintiffs as required by the Purchase Agreement.  Plaintiffs allege, among other things,

5   that 435 and 444 Bridgeway had the following defects:  Required hold-downs were missing from the

6   elevator shaft as was required shear wall; walls were missing sill plate and were not built to plan;

7   steel beaming used that failed to comply with design plans; through bolts were missing as was wood

8   beam packing; steel beams were not correctly packed; welded bolts were used instead of through

9   bolts; hold-down straps for shear to beam attachment missing; excess plywood packing causing

10  "speedbumps"; missing beam bolts; improper stair risers; shear walls incorrectly connected to joist

11  blocking; garage walls not built to plans but built too low; no foundations installed as required in

12  plans; tie downs incorrectly installed; missing deck flashing; missing ceiling vents roof showed signs

13. of failure; improper number of roof drains; vapor barriers missing; insufficient drainage because of

14  the lack of exit routes; stair cases did not meet code requirements; fire sprinkler system failed to meet

15  code.

16      55.     Cross-complainants are informed and believe and therefore allege that any

17  construction defects proved by Plaintiffs are not the fault of Cross-complainants but are the faults of

18  others who performed work on 435 Bridgeway and 445 Bridgeway, including Cross-defendants

19  Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin.

20      56.     The damages recovered by Plaintiffs, if any, against Cross-complainants will be

21  caused primarily and ultimately by Cross-defendants Schnabel Foundation, Harold John Bray,

22  Christopher Hammond, and Johann Stocklin's breach of their contract with Cross-complainants.

23  Cross-complainant's liability for these damages arose, not as a result of any actual fault on their part,

24  but solely by operation of law, arising from imputed liability.

25      57.     In or about March 2002, Cross-complainants gave Cross-defendants Schnabel

26  Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin notice of the action

27  brought by Plaintiffs Gabbert and Lincoln and demanded defense and indemnity.  To date, Cross-

28

CROSS-COMPLAINT FOR DAMAGES

1    defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin

2    have refused Cross-complainants' tender.

3         58.      By reason of the foregoing, Cross-complainants are entitled to indemnity from Cross-

4    defendants Schnabel Foundation, Harold John Bray, Christopher Hammond, and Johann Stocklin in

5    an amount to be proven at trial.

6         WHEREFORE, Cross-complainants pray for damages as set forth below:

7    FIRST CAUSE OF ACTION

8         1.      For consequential damages according to proof;

9         2.      For special damages according to proof;

10        3.      For general damages according to proof;

11        4.      For interest thereon;

12        5.      For attorneys fees and costs of suit;

13        6.      Such further and other relief as the Court deems appropriate.

14    SECOND CAUSE OF ACTION

15        1.      For consequential damages according to proof;

16        2.      For special damages according to proof;

17        3.      For general damages according to proof;

18        4.      For interest thereon;

19        5.      For attorneys fees and costs of suit;

20        6.      Such further and other relief as the Court deems appropriate.

21    THIRD CAUSE OF ACTION

22        1.      For a judicial determination that each Cross-defendants are obligated to fully

23    indemnify Cross-complainants  for (1) all past and future fees and costs incurred to defend that

24    portion of Plaintiff's claims that relate to each cross-defendant's work and (2) all damages claimed

25    by Plaintiff, if any are found to exist, and that arise from each cross-defendant's respective work on

26    the Project.

27

28

2.    For a declaration that Cross-defendants are obligated to fully indemnify Cross-complainants if Cross-complainants are compelled to pay any sum as a result of any damages, judgment, or other award recovered by Plaintiff in this litigation.

3.    Attorneys' fees;

4.    For costs of suit; and

5.    For any and such further relief as justice requires.

## FOURTH CAUSE OF ACTION

1.    Monetary damages as indemnity for the loss or liability incurred, if any, as alleged above;

2.    For attorney's fees and costs incurred in defending and resolving the claim of Plaintiffs Gabbert and Lincoln;

3.    For interest;

4.    For attorney's fees and costs herein incurred; and

5.    For such other and further relief as the court may deem proper.

## FIFTH CAUSE OF ACTION

1.    Monetary damages as indemnity for the loss or liability incurred, if any, as alleged above;

2.    For attorney's fees and costs incurred in defending and resolving the claim of Plaintiffs Gabbert and Lincoln;

3.    For interest;

4.    For such other and further relief as the court may deem proper.

## SIXTH CAUSE OF ACTION

5.    Monetary damages as indemnity for the loss or liability incurred, if any, as alleged above;

6.    For attorney's fees and costs incurred in defending and resolving the claim of Plaintiffs Gabbert and Lincoln;

7.    For interest;

1      8.      For such other and further relief as the court may deem proper.

2    DATED:   April 29, 2002                                     FOREMAN & BRASSO

3

4                                                         By: _____

5                                                              Ronald D. Foreman
                                                              Jacqueline C. Hamilton
6                                                              Attorneys for Defendants and
                                                              Cross-Complainants
7

8

9

10   G:\FAB\Blatt\Pleadings\Cross Complaint.wpd

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2      I am a citizen of the United States, over 18 years of age, and not a party to the within entitled

3  action; I am employed at and my business address is 807 Montgomery Street, San Francisco,

4  California. On this date I served the following document:

5      **CROSS-COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

6

☐      by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the
7          United States mail at San Francisco addressed as shown below.

8  ☐      by facsimile to the facsimile number(s) shown below.

9  X      by causing a true copy thereof to be hand delivered.

10 ☐      by causing a true copy thereof enclosed in a sealed envelope to be delivered by FEDEX at the
         address shown below.

11      I declare under penalty of perjury that the foregoing is true and correct.

12      Executed at San Francisco, California on April 30, 2002.

13

14

15                                                    Nettie L. Heffner

16  <u>Attorney for Plaintiffs</u>

17  Alexander Anolik, Esq.
    Jordan A. Lavinsky, Esq.
18  Alexander Anolik, A Professional Law Corporation
    2107 Van Ness Avenue, Suite 200
19  San Francisco, CA 94109-2536
    Tel:   (415) 673-3333
20  Fax:   (415) 673-3548

21

22

23

24

25

26

27

28

982(a)(9)

**SUMMONS** FOR FIRST AMENDED CROSS-COMPLAINT
*(CITACION JUDICIAL)*

NOTICE TO ~~DEFENDANT~~:    *(Aviso a Acusado)*
PLAINTIFFS AND CROSS-DEFENDANTS :

(SEE ATTACHED CAPTION SHEET FOR PARTY NAMES)

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

FILED

AUG 2 9 2002

JOHN P. MONTGOMERY,
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
BY R. FORD, DEPUTY

**YOU ARE BEING SUED BY** ~~PLAINTIFF~~:
*(A Ud. le esta demandando)*
DEFENDANTS AND CROSS-COMPLAINANTS :
MICHAEL BLATT and CATHERINE BLATT

| | |
|---|---|
| You have **30 CALENDAR DAYS** after this summons is served on you to file a **typewritten response** at this court.<br><br>A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.<br><br>If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court.<br><br>There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). | *Después de que le entreguen esta citación judicial usted tiene un plazo de 30 DIAS CALENDARIOS para presentar una respuesta escrita a maquina en esta corte.*<br><br>*Una carta o una llamada telefónica no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.*<br><br>*Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosas de su propiedad sin aviso adicional por parte de la corte.*<br><br>*Existen otros requisitos legales. Puede que usted quiera llamar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico).* |

The name and address of the court is: *(El nombre y dirección de la corte es)*

CASE NUMBER: *(Numero del Caso)*
CV 020477

Marin County Superior Court
3501 Civic Center Drive
San Rafael, CA 94903

Defendants/Cross-complainants

The name, address, and telephone number of ~~plaintiff's~~ attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de telefono del abogado del demandante, o del demandante que no tiene abogado, es)*

Ronald D. Foreman, Esq.             SBN 061148
Foreman& Brasso                     (415) 433-3475
807 Montgomery Street
San Francisco, CA 94133

DATE:    JUN 1 8 2002          Clerk, by _JOHN P. MONTGOMERY_ , Deputy
*(Fecha)*                      *(Actuario)*  K. MAIN      *(Delegado)*


[SEAL]

NOTICE TO THE PERSON SERVED:    You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)* :
3. ☐ on behalf of *(specify)* :

    under:  ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
            ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
            ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (individual)
            ☐ other:
4. ☐ by personal delivery on *(date)* :

*(See reverse for Proof of Service)*
**SUMMONS**

CCP 412.20

# EXHIBIT 9

# FOREMAN & BRASSO
### ATTORNEYS AT LAW

Ronald D. Foreman
Russell F. Brasso
Jacqueline C. Hamilton

930 Montgomery Street, Suite 600
San Francisco, California 94133
Tel: 415.433.3475
Fax: 415.781.8030
www.foremanandbrasso.com

Marin Office
21 Tamal Vista Boulevard, Suite 174
Corte Madera, CA 94925

September 7, 2004

*__Via Facsimile and U.S. Mail__*
Number of Pages: 4

Joseph D. Ryan, Esq.
Ryan & Lifter
2010 Crow Canyon Place
Suite 330
San Ramon, CA 94583

**Fax:** (925)884-2090

Re:    *Gabbert and Lincoln v. Blatt, et al*

Dear Joe:

In accordance with our conversation, enclosed is a Stipulation for Substitution of Attorney for the appeal of the above-referenced matter. I will forward the Substitution to the Blatts for their signatures as soon as you sign and return the Stipulation to us.

As discussed in our conversation, the designation of record on appeal must be done *immediately by your firm as the reasons set forth hereinafter*. The deadline for filing was August 31, 2004. The clerk of Marin Superior Court served a notice of failure to cure default on September 1, 2004. Jackie Hamilton checked the Court of Appeal docket. The Court of Appeal is in receipt of the notice of failure to cure default and they are in the process of preparing the dismissal order.

As we also discussed, the break-down of the attorneys' fees settlement leads to a whole host of problems which you described to me. They include the following: the need to address the Appellate Court default; the designation of record; the posting of a bond to prevent execution of the judgment on the Blatt assets; the cost of the reporter's transcript, and other items which we may have discussed but which are omitted from this letter. On balance, if the Gabbert/Lincoln-Liberty Mutual attorneys' fee dispute is promptly resolved all of these issues go away. Based upon your report and my conversation with Mike Barnette, that does not seem likely. As I have expressed to everyone from the beginning Mike Blatt wants this matter behind him as it impacts on his real estate business. The intent of the appeal was to protect Mike Blatt's legal rights and

FOREMAN & BRASSO

*Gabert v. Blatt*
September 7, 2004
Page 2 of 2

give Liberty Mutual the opportunity to negotiate a fee payment deal or pursue the appeal.  As we know Liberty Mutual wanted to hire your firm to do the attorneys' fee appeal.  This was expressed by me to you and Mike Barnette and I always anticipated that we would be out of this matter by the time Mike Blatt paid the damage judgment.  Mike Blatt paid the damage judgment last week.  As the costs have also been paid to Gabbert and Lincoln, only the attorneys' fee issue remains.  The filing of the Stipulation for Substitution of Attorney should not get in the way of the filing of a Designation of Record by your firm to protect the appeal.

Very truly yours,
FOREMAN & BRASSO



onald D. Foreman

Enclosure
cc:     Client (via fax)
        Michael Barnette (via fax)

G:\FAB\Blatt\Correspondence\ryan 090704.wpd

No. A107160

**Court of Appeal**

**of the**

**State of California**

**First Appellate District, Division 2**

JAMES GABBERT AND MICHAEL LINCOLN,

    Plaintiffs and Respondents,

    vs.

MICHAEL BLATT, CATHERINE BLATT,

    Defendants and Appellants.

—————————————————

Appeal from the Superior Court for Marin County

Lynn Duryee, Judge

—————————————————

**STIPULATION FOR SUBSTITUTION OF ATTORNEY**

—————————————————

    The parties hereto, through their respective counsel, stipulate that Defendants and Appellants

Michael and Catherine Blatt may substitute former legal representative Ronald D. Foreman of

Foreman & Brasso for new legal representative Joseph Ryan of Ryan & Lifter.  Joseph Ryan's

**Stipulation for Substitution of Counsel**

1  business address and telephone number is: 2010 Crow Canyon Place, Suite 330, San Ramon, CA

2  94583, (925)884-2080.

3      I consent to this substitution:

4  Dated: _____, 2004

5                                          _____
                                           Michael Blatt
6

7  Dated: _____, 2004

8                                          _____
                                           Catherine Blatt
9      I consent to this substitution:

10 Dated: **9/7**_____, 2004

11                                         _____
                                           Ronald D. Foreman
12     I consent to this substitution:

13 Dated: _____, 2004

14                                         _____
                                           Joseph D. Ryan
15

16

17 G:\FAB\Blatt\Pleadings\stipulation for substitution of attorney.wpd

18

19

20

21

22

23

24

25

26

27

28

**Stipulation for Substitution of Counsel**

# EXHIBIT 10

**FOREMAN & BRASSO**

RONALD D. FOREMAN
RUSSELL F. BRASSO

ATTORNEY AT LAW
807 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94133
(415) 433-3475
FAX (415) 781-8030

WASHINGTON OFFICE
1601 CONNECTICUT N.W. SUITE 200
WASHINGTON, D.C. 20009
MICHAEL R. KAIN

March 21, 2002

Liberty Mutual Insurance Company
Claims Department
6130 Stoneridge Mall Road, Suite 400
Pleasanton, CA 94588

Schnabel Foundation Company
45240 Business Court, Suite 250
Sterling, Virginia 20166-6703
Attn: Norman Garfield

Re:    Your Insured:  Michael Blatt
       Policy No.    TB1-131-011670-397
       SFC Job No.   9-2476, 435-445 & 476 Bridgeway, Sausalito, CA
       *Gabbert v. Blatt* - Marin Co. Superior Court Case No. 020477

TO WHOM IT MAY CONCERN:

Please understand that this office represents an additional name insured under the Liberty Mutual policy, Michael Blatt. By this correspondence, I am tendering for defense and indemnification the enclosed complaint. Although the complaint reads January 29, 2002, as the filing date, service was accepted on March 7, 2002, and a response will not be due until April 6, 2002.

Please understand that this office has represented Michael and Catherine Blatt in the past and will be representing him in any claims not covered by the Liberty Mutual policy of insurance. To the extent that there is coverage for the claims made under this policy, we are offering to represent Liberty Mutual and Michael Blatt. This office is experienced in construction defect and meets all requirements under Civil Code Section 2860.

I welcome your reply.

Very truly yours,
FOREMAN & BRASSO

Ronald D. Foreman

RDF/nlh
Enclosures
cc:    Client (w/o enclosures)
G:\FAB\Blatt\Correspondence\Liberty Mutual.wpd